# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Priscilla Saunders and
Jason Branden

      Plaintiffs,

vs.

Mayo Clinic,

      Defendant.

Court File No. 13-CV-1972 (JNE/HB)

**MEMORANDUM OF LAW IN
SUPPORT OF MAYO CLINIC'S
MOTION FOR SUMMARY
JUDGMENT**

Plaintiffs Priscilla Saunders and Jason Branden (separately, "Saunders" and "Branden"; together, "Plaintiffs") sued Defendant Mayo Clinic ("Mayo") for disability discrimination in the area of public accommodation in violation of Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 794. Plaintiffs' claims stem from their overarching allegation that Mayo intentionally discriminated against them by providing an ineffective American Sign Language ("ASL") interpreter at three of Saunders' prenatal medical appointments in December 2010 and January 2011.

Nearly all of the ADA/RA lawsuits historically brought against providers by deaf patients have involved allegations of discrimination arising from the provider's refusal to provide an interpreter altogether. This case is unusual in that the parties agree Mayo provided Plaintiffs an interpreter at every appointment where one was requested. Plaintiffs' claims are instead premised on their belief that they had a right to request their "preferred" interpreter, and that Mayo violated the law by providing them, on limited

occasion, with an interpreter for whom Plaintiffs allege they had to sometimes slow down, repeat, or alter their style of signing and fingerspelling.

Far from establishing intentional discrimination, the undisputed evidence shows that by employing multiple staff ASL interpreters, in addition to contracting with freelance interpreters when such interpreters were needed and available, Mayo went well-beyond the ADA/RA requirements. The evidence further establishes that Plaintiffs were provided access to Mayo's services through the use of multiple, alternative auxiliary aids enabling Plaintiffs to effectively communicate with Saunders' medical providers. The undisputed evidence also reveals that when Mayo attempted to meet with Plaintiffs to address their concerns, Plaintiffs refused to engage in any further dialogue with Mayo because Plaintiffs believed, in their own words, it would be a "waste of time."

As this Court noted when dismissing a seminal case involving similar claims, "[o]ne is reminded that it takes very little to turn a simple problem into a 'federal case.' Ultimately, however, it is also a reminder that not all federal cases are meritorious.[1]" Because no reasonable factfinder could find in Plaintiffs' favor based on the record evidence and their claims fail as a matter of law, summary judgment should issue.

---

[1] Loye v. Cnty. of Dakota, 647 F. Supp. 2d 1081, 1083 (D. Minn. 2009), aff'd 625 F.3d 494 (8th Cir. 2010), cert. denied 131 S. Ct. 2111 (2011).

706694.v5

# UNDISPUTED MATERIAL FACTS[2]

## A.    Parties.

Mayo Clinic is a Minnesota nonprofit health care organization and worldwide leader in medical care, research, and education. (Torrens-Burton Decl. ¶¶2-3.) Mayo's central Minnesota campus, consisting of several hospitals and clinics in Rochester, is located approximately 90 miles southeast of downtown Minneapolis. (Id. ¶4.) Mayo Clinic in Minnesota was recently recognized as the best hospital in the nation for 2014-2015 by U.S. News and World Report. (Id. ¶5.)

Plaintiffs Saunders and Branden, though unmarried, are long-term companions. (Branden 7:9-8:13.[3]) Saunders was born deaf, and she communicates primarily through ASL. (Saunders 27:13.) Saunders also communicates through written English, which according to Plaintiffs' proffered expert, while not native, "is good," and Saunders' "reading is adequate for most everyday purposes." (Shepard-Kegl Report at 64, 67.) Saunders graduated from high school and has completed 2.5 years of post-secondary education. (Id. at 59.)

Branden was born deaf, and he communicates primarily through ASL. (Branden 10:6-7, 12:2-3.) Branden can also lip read "fairly well," and his speech mechanics are

---

[2] Although Mayo has summarized the facts herein in the light most favorable to Plaintiffs as required by Fed. R. Civ. P. 56, Mayo reserves the right to dispute any of these facts at trial.

[3] All deposition transcripts are cited using the deponent's last name, followed by the specific page and line and/or exhibit reference(s) supporting the factual statement.

"above-average." (Saunders 39:3-6; Shepard-Kegl Report at 72-75.) In addition, Branden wore hearing aids at Saunders' Mayo appointments. (Branden 10:6-11, 31:4-6.)

**B.    Mayo's Interpreting Services.**

Mayo operates a Language Services department dedicated to providing interpreters and other forms of communication assistance to patients, companions, and staff utilizing Mayo's services. (Torrens-Burton Decl. ¶6.) Language Services helped effectuate Mayo's Communication Assistance policy, which provided during the timeframe at issue:

1. In accordance with federal and state law, communication aids for patients/families who are non-English or limited English speaking, vision-impaired, hearing-impaired, and/or speech-impaired are available to patients and families at no cost.

2. May offers and honors requests for sign language interpreters by patients who are deaf or hard of hearing.

\* \* \*

6. If a patient declines to use the free Mayo interpreter services, the patient may use an adult family member or friend if the use of that person does not compromise the effectiveness of the care or violate confidentiality.... Whenever possible, a Mayo interpreter should be present when a family member or friend is interpreting to insure accuracy.

(Id.; Rasmusson Ex. 6.)

In order to ensure access to interpreting services, Mayo directly employs interpreters for many languages, including ASL, in addition to utilizing freelance and supplemental interpreters, as well as video-relay and other telecommunication device services to provide interpretation assistance as needed. (Torrens-Burton Decl. ¶7.) The number of individuals for whom Mayo provides interpreting services is staggering; for

example, in 2010, for merely one language, ASL, Mayo provided interpreters at over **1,800** appointments. (Rasmusson Ex. 5; Winter Decl. ¶¶2-3.)

During the timeframe identified as being at issue in the Complaint, November 2010 through January 2011, (Compl. ¶¶13-15), Mayo employed two ASL staff interpreters, one of whom was Linda Rasmusson. (Rasmusson 75:2-4.) Rasmusson worked for approximately ten years as a licensed practical nurse before obtaining her sign language interpreting degree in 1996. (Rasmusson 7:1-10, 8:14-21, 10:3-12:3, 19:19-24.) From 1996-2000, Rasmusson worked as an interpreter for Winona State University. (Rasmusson 20:20-21:4.) Rasmusson is unaware of any complaints regarding her interpreting while she worked at Winona State. (Rasmusson 23:8-11.)

In 2001, Rasmusson obtained National Association of the Deaf ("NAD") Level III certification, (Rasmusson 28:3-5), and she began working as an interpreter for Rochester Technical College. (Rasmusson 21:15-23.) From 1996 to 2007, Rasmusson also provided freelance interpreter services through Communication Services for the Deaf ("CSD") after passing an initial test on voicing and signing. (Rasmusson 22:18-25, 24:11-25.) While freelancing for CSD, Rasmusson provided interpreting services at many clinics and hospitals in the Rochester area. (Rasmusson 24:21-25:1.) Rasmusson is unaware of any complaints regarding her interpreting while at Rochester Technical College or CSD. (Rasmusson 23:12-17).

In January 2007, Mayo hired Rasmusson as a supplemental interpreter. (Hughes 50:13-16.) In conjunction with her hiring, Mayo tasked its full-time staff interpreters, Kathryn Dorsett and Eileen Bruns, to evaluate Rasmusson's interpreting skills.

5

(Rasmusson 47:1-13, 47:19-24, Ex. 4 at DEF258-265.) Dorsett's and Bruns' evaluation forms reflect that they scored Rasmusson in the 90th percentile in most areas. (Rasmusson Ex. 4 at DEF258-265.) Based on her successful completion of this evaluation, Mayo hired Rasmusson. (Hughes 50:13-17.)

After hiring Rasmusson, Mayo assigned Dorsett to accompany and observe Rasmusson on her first series of patient visits. (Dorsett 64:23-25.) Dorsett shadowed Rasmusson at nine appointments. (Rasmusson Ex. 4 at DEF257.) The Observation Documentation Form directed Dorsett to note whether the new interpreter had any "issues related to medical terminology, deaf culture, service, [or the] patient." (Id.) Dorsett did not indicate on the form that she observed any issues with Rasmusson's performance. (Id.)

### C. Mayo Honors Saunders' Preference For Dorsett.

In 2004 or 2005, Saunders began visiting Mayo for neurology appointments. (Saunders 26:5-18.) Saunders recalls having staff interpreters (Dorsett or Bruns) for some of these appointments, as well as Rasmusson, who was still a freelancer through CSD. (Saunders 15:12-13; 23:21-24:2; 26:5-18; Rasmusson 22:18-25, 24:11-25.)

According to Saunders, her communication with Dorsett "was very smooth" and "flowed very well." (Saunders 16:5-10.) Saunders testified, "[Dorsett] has deaf parents herself as well, so I think she understood me very clearly." (Saunders 17:20-22.) Conversely, Saunders testified she disliked having to "slow down [her] signs" for the

other staff interpreter (who is not a "child of deaf parents," or "CODA").[4] (Saunders 27:2-6; see also Bruns 7:25-8:16.) Saunders complained, "I had to slow down my signs for the interpreter and that isn't something I normally do." (Saunders 27:2-6.)

Based on Dorsett's suggestion, Saunders asked Mayo in 2004-2005 to put Dorsett on her "preferred list." (Saunders 17:9-11, 26:2-18.) Mayo honored this request, and Dorsett became Saunders' "go to" interpreter. (Saunders 21:25-22:1; Compl. ¶14.) Mayo provided Dorsett "so frequently" for Saunders' appointments, that Saunders eventually considered Dorsett a friend. (Saunders 15:4-17.)

In February 2010, Mayo terminated Dorsett because she made misrepresentations in time records and an application for short-term disability benefits. (Dorsett 16:18-21, Ex. 2.) Because she was terminated, Mayo would no longer permit Dorsett to provide interpreting services on its campus. (Dorsett 67:22-68:3; Hughes 182:2-10.)

### D. Mayo Provides Saunders With Freelance Interpreters From July To December 2010.

In 2010, Saunders became pregnant. (Saunders 7:24-25, 24:14-19.) Due to a previous C-section, Saunders chose Mayo in hopes of having a vaginal-birth-after-cesarean ("VBAC"), which Saunders' regular provider would not consider. (Saunders

---

[4] Since Rasmusson was not a staff interpreter in 2004-2005, Mayo assumes for purposes of this motion that Saunders was referring to Bruns. (See Rasmusson 22:18-25, 24:11-25; Hughes 50:13-17.) Because the record does not reflect that Bruns served as Plaintiffs' interpreter for any appointments within six years of Plaintiffs' commencement of this suit, the issue of whether Bruns was a "qualified interpreter" is not germane to Plaintiffs' claims. Gaono v. Town & Country Credit, 324 F.3d 1050, 1056 (8th Cir. 2003) (holding six-year statute of limitations applies to ADA Title III and Rehabilitation Act claims).

706694.v5

22:9-10; Compl. ¶12.) At Mayo, Saunders saw Dr. Norman Davies for her prenatal appointments. (Saunders 24:14-24.)

On July 2, 2010, Saunders had a neurology appointment where Rasmusson provided interpreting services. (Rasmusson Ex. 5 at DEF00295.) After this appointment, Saunders called Rasmusson's supervisor, Jane Hughes, complaining Rasmusson was "slow" and not interpreting with "high enough ASL." (Hughes 21:10-12, 88:17-23, 89:12-15.) In response, Hughes instructed Language Services staff to "provide an appropriate interpreter for [Saunders]," which meant trying to locate freelance or supplemental interpreters for her appointments. (Id. 89:3-11.)

Thereafter, to the best of its ability, Mayo provided Saunders with freelance and supplemental interpreters for Saunders' appointments. (See Rasmusson Ex. 5 at DEF295-309.) Indeed, Saunders received freelancers for all of her appointments from 07/08/10 to 12/03/10, and Saunders confirms she had no complaints about the interpreting services Mayo provided during this time. (Id.; Saunders 44:23-45:1.)

### E. Mayo Struggles To Find Freelance Interpreters Over The Holidays In 2010.

After Saunders expressed a preference for freelance interpreters, Mayo did its best to accommodate her request. (See Saunders 34:8-17; 44:23-45:2; Rasmusson Ex. 5.) However, a significant shortage of ASL interpreters able and willing to provide medical interpretation exists throughout the country, and in the southern Minnesota area, in particular. (Bell 120:4-12; Hughes 184:11-22; Witter-Merithew Report at 13, 15.) With respect to the issue of interpreter availability, Teresa Bell, who is the Southern Regional

Manager for the Deaf/Hard of Hearing Services division of the Minnesota Department of Human Services (MDHS), testified, "**[I]n the Southern Minnesota area[,] interpreters are difficult to find. We don't have the resources like … the Twin Cities.**[5]" (Bell 6:17-18, 74:9-14, 119:23-25 (emphasis added).) Consequently, although Mayo tried to accommodate patient requests for freelancers during the timeframe at issue, the organization's ability to do so was dictated by freelancer availability. (Hughes 76:22-77:3.)

It will likely come as no surprise that Mayo found it especially difficult to find freelancers willing to travel to Rochester in the middle of a Minnesota winter to interpret for (typically short) patient appointments.[6] (Hughes 180:25-181:12; Rasmusson Ex. 5.) The record confirms that on average, freelancers interpreted for significantly fewer appointments in winter months.[7] This proved to be true in December 2010, when freelancers interpreted for only four out of 99 total appointments where sign interpreters were utilized that month. (Rasmusson Ex. 5 at DEF309-311; Winter Decl. ¶4.)

---

[5] Bell also confirmed she considers Rochester to be in the southern regional area, and that she is aware there is a shortage of qualified interpreters in general for medical settings. (Bell 120:1-20.)

[6] As illustrated in Rasmusson Exhibit 5, the vast majority of patient appointments lasted between 30 to 90 minutes.

[7] From March to October 2010, ASL freelancers interpreted for a monthly average of 13.125 appointments. (Rasmusson Ex. 5 at DEF286-307; Winter Decl. ¶5.) Conversely, from January to February 2010 and November 2010 to January 2011, freelancers interpreted for a monthly average of four appointments. (Rasmusson Ex. 5 at DEF282-286, 307-313; Winter Decl. ¶5.)

Unable to locate a freelancer for Saunders' 12/10/10 appointment, Mayo sent Rasmusson to interpret. (Rasmusson Ex. 5 at DEF310.) Saunders testified that as soon as she saw Rasmusson, she became frustrated, even though Rasmusson had not interpreted for her for over five months. (Saunders 47:9-12.) Rasmusson confirms upon sight, Saunders immediately signed, "**I don't want you.**" (Rasmusson 86:2-9 (emphasis added.)

Following the 12/10/10 appointment, Plaintiffs complained to Hughes about Rasmusson's assignment as their interpreter. (Saunders 38:9-16.) Saunders alleges Hughes "encouraged [Plaintiffs] to give [Rasmusson] a chance," which Saunders testified she was unwilling to do. (Saunders 33:10-15, 35:20-22.) Plaintiffs also claim Hughes told them Saunders "had to accept her staff interpreters." (Saunders 33:13-14.) Saunders "was not pleased with the conversation." (Saunders 33:10-15.) In response to Hughes' offer to meet with Plaintiffs to try to resolve their concerns, Plaintiffs told Hughes, "no thanks." (Saunders 35:3-8, Ex. 4 at DEF266; Branden 33:21-34:4.)

Although this aspect of the situation is notably absent from their Complaint and deposition testimony, Plaintiffs did report, contemporaneously with these events, that Hughes explained to them Mayo was having difficulty finding freelance interpreters. (See Saunders Ex. 7 at Saunders000011.) Specifically, on January 5, 2011, Saunders called the Emergency Statewide Advocacy and Training Project, a program operated by CSD through a grant from MDHS, to make a complaint about Mayo. (Id. at Saunders0000010; Saunders 115:5-118:4.) Plaintiffs' counsel, Heather Gilbert, who worked for CSD as an

"advocate for deaf services" and was not yet an attorney at the time,[8] completed the intake and interviewed Saunders. (Saunders 115:2-116:6, 117:2-21.) With respect to freelancer availability, Gilbert's summary of Saunders' statements during the CSD intake interview quote Saunders as signing,

> Before my next appointment [after the 12/10/10 appointment], I called Jane Hughes ... and asked why Ms. Rasmussen [sic] had been the interpreter at my past two[9] appointments. **[Hughes] stated that they could not find free lance interpreters anymore because they were not available.** At this point, [Hughes] asked me to make due with [Rasmusson] by signing slower and at a lower level (or more simple level) of [ASL] so that Ms. Rasmussen [sic] could understand.

(Saunders Ex. 7 at Saunders000011 (emphasis added).)

### F. Mayo Locates A Freelance Interpreter For Saunders' Next Appointment.

Saunders' next appointment was scheduled for the morning of 12/17/10. (Rasmusson Ex. 5 at DEF310.) Prior to this appointment, Saunders called Mayo to reschedule for later that same day because of a Christmas concert. (Saunders 48:16-19, Ex. 4 at DEF266.) When Scheduling informed Saunders that no interpreters (presumably, aside from Rasmusson) were available for her new appointment time, Saunders called Patient Services "to file a complaint and explain that **I do need an interpreter that meets my satisfaction, period.**" (Saunders 52:7-10, Ex. 4 at DEF266 (emphasis added).)

---

[8] Mayo placed Plaintiffs and counsel on notice that Mayo believes Ms. Gilbert is a fact witness and cannot represent Plaintiffs at trial should this matter proceed beyond summary judgment.

[9] This is inaccurate. The records confirm Rasmusson only interpreted for **one** appointment in December 2010 (12/10/10) before Saunders called Hughes to complain. (Rasmusson Ex. 5 at DEF310.)

Patient services assured Saunders an interpreter would be available. (Saunders 52:1-6, Ex. 4 at DEF266.)

Saunders learned Mayo had still been unable to find an alternative interpreter for her appointment when she called to check on the status of her request on 12/16, the day before her appointment. (Saunders Ex. 4 at DEF266.) Upset, Saunders contacted Hughes' supervisor, International Services Operations Manager David Voller, via e-mail. (Id.; Voller 6:6-22.) The e-mail is written entirely in Saunders' own words. (Saunders-Dep. 45:9-14.) Saunders indicated,

> ... I am NOT happy with how the conversation went with [Hughes]. She proposed [a meeting with the staff interpreters]. I told her, no thanks, [b]ecause they are not qualified for my communication ability and I don't want to go further into this with her anymore about those two staff.
>
> I only wish to be respect[ed] with what I am comfortable with. And its also my right[] to have [a] proper interpreter who's able to understand me clearly without stopping me to repeat or for me to slow or make sure they understand what I'm saying.
>
> ... **I hope to hear from you soon and see what can be done from now and on.**

(Saunders Ex. 4 at DEF266 (emphasis added).)

Voller responded within less than two hours. (Id. at DEF267.) After acknowledging Saunders' frustrations, Voller reiterated Hughes' suggestion that they meet to resolve Plaintiffs' concerns:[10]

---

[10] Hughes' and Vollers' requests to meet with Plaintiffs were consistent with the Language Services department's "normal protocol" to first meet with a person who has raised concerns about an interpreter, whether spoken or sign language, and if that proves unsuccessful, to next engage Patient Affairs. (Voller 68:19-69:8.)

> In closing I truly would like the opportunity to meet. I would like to have you help us (Jane [Hughes], … Linda [Rasmusson] and myself) better understand what is not happening…. Provide us with examples by which we can better understand or learn from…. In turn we may need to make sure that expectations are mutually agreed upon in which the relationships can grow positively.

(Id.) After also sharing that Mayo recently hired a NAD Level 5 certified interpreter, Voller closed by writing, "Please accept this response as an invitation and if initially just with me that is fine but I truly believe the richest experience we all will get out of this is when we all talk together." (Id.)

Neither Saunders nor Branden responded to Voller. (Voller 80:22-25; Saunders 53:8-54:7.) According to Saunders, Plaintiffs "never met" with Voller because Saunders was not interested since she "knew that he would not be able to meet [her] needs." (Saunders 53:8-54:7, 54:19-22.) In her own words, Saunders thought working with Mayo would be a "**waste of [her] time**." (Saunders 36:3-10.)

As Saunders and Voller exchanged emails, Mayo continued to search for an available freelance interpreter for Saunders' 12/17/10 appointment. (Voller Ex. 1 at DEF268.) The record confirms Mayo contacted CSD for a freelancer, and CSD was likewise unable to find one. (Id.) Fortuitously, the day of Saunders' appointment, a supplemental interpreter, Danella Bohland, with whom Saunders "had no problem," became available, so Mayo was again able to honor Saunders' request for an interpreter other than Rasmusson. (Saunders 54:13-18, 79:9-11, Rasmusson Ex. 5 at DEF310.)

### G. Saunders' Last Appointment In December 2010.

Mayo scheduled Rasmusson to interpret at Saunders' next appointment on 12/27/10. (Saunders 56:21-24, Rasmusson Ex. 5 at DEF310.) When Rasmusson entered the room with Dr. Davies, Saunders became "instantly angry." (Rasmusson 107:13-19; Saunders 56:25-57:1.) She told Rasmusson that she could not "be [Saunders'] interpreter [because Saunders was] not going to have [her]." (Rasmusson 107:19-21.)

Plaintiffs proceeded to have a disagreement with one another regarding whether Rasmusson should stay for the appointment. (Rasmusson 108:3-5.) Rasmusson interpreted their disagreement for Dr. Davies so he was aware of their dispute. (Rasmusson 109:18-22.) If Plaintiffs had asked her to leave, Rasmusson testified she would have asked the physician whether he wanted her to leave, since the interpreter is there for the provider's benefit, as well. (Rasmusson 108:11-14.) However, Rasmusson never needed Dr. Davies' input because the appointment continued without Plaintiffs expressing a clear directive for Rasmusson to leave. (Rasmusson 111:7-10).

At this appointment, Dr. Davies noted Saunders still wanted a VBAC, but she had not gone into labor. (Davies 35:23-24). Saunders insisted on being induced that day because she was "ready to be done." (Rasmusson 113:2-5.) Even when Dr. Davies indicated it was too early to induce labor, Saunders continued to pressure him. (Rasmusson 113:6-9.)

During this appointment (as well as Saunders' appointments on 12/10/10 and 01/04/11), Dr. Davies recalled that while discussing these "very complicated concepts," he received appropriate responses from Saunders. (Davies 30:20-23.) To him, these

14

responses indicated a level of understanding that would enable Saunders to make informed choices about her treatment. (Davies 30:20-23, 32:1-2.)

Dr. Davies made a notation in Saunders' record on 12/27/10 that Saunders remained a viable candidate for an artificial rupture of membranes ("AROM" or "water break"), which is another method of inducing labor that would allow Saunders to deliver through a VBAC. (Davies 36:15-20; Saunders Ex. 5 at Mayo00003.[11])

### H. Plaintiffs Refuse To Engage In The Interactive Process.

Although Saunders had an appointment with Dr. Davies scheduled for the following day, Saunders called Mayo on 01/03/11 because she wanted to "go to the hospital now and 'have [her] waters broken.'" (Saunders Ex. 5 at MAYO00003.) She informed the nurse, Pat Gallenberg, that she "really just want[ed] to be delivered" because "she [was] done and just [couldn't] take it anymore." (Id.; Saunders 64:13-19, 66:5-6.) In addition, Saunders alleged the interpreter at her last appointment (Rasmusson) might have misunderstood her and, therefore, failed to communicate this message to Dr. Davies. (Saunders 64:20-23, Ex. 5 at MAYO00003.) Saunders further reported she felt "overtired" and unable to sleep due to her need to use the bathroom frequently. (Saunders 64:24-65:5, Ex. 5 at MAYO00003.) After speaking with Saunders, Gallenberg documented that Saunders was "very frustrated that she cannot be induced now." (Saunders Ex. 5 at MAYO00003.)

During her deposition, Saunders confirmed she asked to be induced on 01/03/11, not because of her frustrations with Mayo's staff interpreters, but because:

---

[11] Saunders' medical records are filed under seal.

[I] was giving up. I was really struggling and so I just wanted to go with [a C-section]. I didn't want to wait any longer. It was too long. I was afraid that the VBAC would not work. The baby was too large. I just gave up because I was so tired.

* * *

[Dr. Davies' suggestion of waiting] [a]nother week is a long time. My concern was I wasn't getting enough sleep, and the issue related to seizures. It triggers seizures and I was afraid of fail – failing with the VBAC. So I just didn't want to wait another week as a result. Because the baby would be too big one more week.

(Saunders 70:15-22, 73:6-11.)

## I. Voller And Hughes Try To Meet With Plaintiffs Prior To Saunders' 01/04/11 Appointment.

Meanwhile, Voller still had not received a response from Plaintiffs to his December 16th e-mail. (Voller 82:1-3.) With Saunders' next appointment approaching quickly (January 4), Hughes approached Voller to discuss her concern that Rasmusson was scheduled to interpret for that appointment. (Voller 81:5-7.) Through an email on January 3rd, Voller proposed going to meet with Saunders prior to the appointment, if she was unwilling to come to his office. (Voller 88:2-6; Voller Ex. 1 at DEF271-272). Hughes agreed with this proposal. (Voller Ex. 1 at DEF00271.)

On January 4th, Voller, Hughes, and Rasmusson went to meet with Plaintiffs approximately 15 minutes before Saunders' scheduled appointment time. (Hughes 198:4-5; Voller 93:17-23, 95:10-12, 96:4-7.) When they asked for a space in which to meet

Plaintiffs before Saunders' appointment, nursing staff provided an open exam room.[12]

(Voller 95:7-14, 96:4-7.) A nurse then escorted Plaintiffs and Saunders' sister from the

waiting room to the patient room where Voller, Hughes, and Rasmusson were waiting.

(Branden 75:19-25.)

Voller introduced himself and briefly explained that he wanted to "understand

what [Saunders] concerns were about the services that [Mayo was] providing." (Voller

98:18-23.) Saunders refused to speak with Voller or Hughes. (Rasmusson 132:21-22.)

Instead, she abruptly walked out of the room.[13] (Voller 99:20-22, 104:10-11.)

After Saunders left, Voller spoke with Branden about Plaintiffs' concerns with the

staff interpreters. (Voller 100:13-17; Branden 94:9-12.) This conversation is the only

time Branden personally complained about Mayo's interpreters. (Branden 94:5-12.)

During their conversation, Branden claimed NAD Level III certified interpreters were not

"qualified" to interpret in a medical setting. (Branden 95:11-17.)

Later that same day, Voller sent Saunders an email clarifying the purpose of his

visit and to express that Mayo took her concerns seriously. (Saunders Ex. 4 at DEF273-

274.) As a reminder, he reiterated that the staff interpreters performed a dual function by

---

[12] It was not uncommon for Voller and Hughes to meet with patients exam rooms, so long as those meetings took place outside of medical care (e.g., before or after appointments). (Voller 100:18-101:13.) Dr. Davies confirmed his treatment of Saunders on 01/04/11 was completed separately from Plaintiffs' meeting with Language Services staff. (Davies 23:5-6; Saunders 80:9-12.)

[13] Plaintiffs' Complaint alleges someone blocked Saunders from leaving the exam room. (Compl. ¶24.) Saunders claims Hughes blocked her exit. (Saunders 79:12-14.) Branden claims Rasmusson blocked Saunders' exit. (Branden 79:8-12.) Plaintiffs agree the room was very small, especially to fit six people. (Branden 79:13-14; Saunders 79:14-17.)

serving as interpreters not just for the patient, but also for the physician. (Id.) Once again, Voller offered to meet with Saunders. (Id.)

### J. Plaintiffs' Exchanges With Dr. Davies During Saunders' 01/04/11 Medical Appointment.

After Hughes and Voller left, Rasmusson remained to interpret for Saunders' appointment with Dr. Davies. (Rasmusson Ex. 5 at DEF311.) Saunders demanded Rasmusson leave the room several times. (Saunders 69:5-6; Branden 84:20-85:6.) Branden asserted to Davies that Rasmusson was unqualified to interpret. Having never felt Rasmusson provided inaccurate information, Dr. Davies was unconvinced. (Davies 23:22-23; Branden 85:5-6.) Dr. Davies observed that Saunders' responses to "sometimes quite complicated questions were appropriate, [which] implied that both [his] concept was passed over accurately and that her concept or her thoughts were passed back to [him]." (Davies 23:18-22.) Dr. Davies believed Plaintiffs' issue with Rasmusson was personal, and he ultimately requested that Rasmusson stay for **his** benefit. (Davies 23:17; Branden 84:24-85:1; see also Rasmusson Ex. 6.) Ignoring Rasmusson, Plaintiffs chose instead to rely on Branden's lip-reading (and hearing) ability to communicate with Dr. Davies. (Saunders 69:6-7; Branden 85:10-11.)

When she called Mayo on 01/03/11, Saunders wanted to have her water broken. (Saunders Ex. 5 at MAYO00003.) However, when Dr. Davies examined her the following day, he concluded that Saunders' physical condition would make an AROM (water break) procedure "extremely difficult." (Id.) Medical records indicate Saunders

nevertheless wanted to deliver the baby that same day because she felt "really very uncomfortable." (Id.; Davies 40:12-13, 47:2-7.)

In light of Saunders' discomfort, Plaintiffs informed Dr. Davies they would like to have a C-section the following day at Mayo Hospital. (Branden 67:18-23.) Ultimately, Plaintiffs knew a VBAC delivery was always only a possibility. (Saunders 56:7-9; Branden 70:19-21.) After leaving Mayo, however, Plaintiffs decided instead to schedule the C-Section at the hospital in their hometown of Faribault, where Plaintiffs could use discharged Mayo employee Dorsett, who was Saunders' "preferred" interpreter.[14] (Saunders 73:18-20, 83:22-84:3, 85:22-86:1; Dorsett 71:12-72:4.)

## K.     Saunders' Final Mayo Appointment.

On July 11, 2011, Saunders visited Mayo for a neurology appointment. (Saunders 83:4-9.) Prior to her arrival, Saunders notified Mayo she did not want an interpreter for this appointment, so Saunders was "very surprised" to see Rasmusson when she arrived. (Saunders 84:12-17.) Saunders wrote a note to a nurse indicating she would leave if Rasmusson stayed for the appointment. (Saunders 84:18-25.) Accordingly, Rasmussen left, and Saunders and the physician instead communicated by exchanging written notes. (Saunders 85:1-6.) Saunders does not allege she was unable to effectively communicate with the physician through this alternative means.

---

[14] Like other freelancers, Dorsett placed limits on how far she was willing to drive to provide interpreting services. When Saunders subsequently had a third child, Dorsett did not interpret at the delivery because "Shakopee is too far for [Dorsett] to travel." (Saunders 86:2-6.)

**LEGAL ARGUMENT**

Plaintiffs' claims are subject to summary dismissal for two reasons. First, they cannot establish a *prima facie* case of discrimination. Second, they fail to meet their burden of showing they are entitled to injunctive relief or compensatory damages, the only two forms of relief available under the ADA and RA.

In addition, Branden's claims separately fail because as a companion, he lacks statutory standing to bring claims under the ADA/RA.

## I.      LEGAL STANDARDS.

### A.      Summary Judgment.

Summary judgment is not disfavored, but is instead "a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011). It is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, a Rule 56 motion must be granted when the nonmoving party fails to make a sufficient showing on *any* of the essential elements of [a] claim. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"Although the burden of demonstrating the absence of any genuine issue of material fact rests on the movant, a nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." Barber v. C1 Truck Driver Training, LLC, 656 F.3d 782, 791 (8th Cir. 2011). "The mere existence of a scintilla of evidence in support of the nonmovant's position will be

20

insufficient; there must be evidence on which the jury could reasonably find for the nonmovant." Id. at 791-792. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986).

**B.      Evaluating Plaintiffs' ADA/RA Claims.**

Plaintiffs' discrimination claims arise under Title III of the ADA and Section 504 of the RA. Title III, which applies to public accommodations including medical providers, prohibits discrimination "on the basis of disability in the full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. §§ 12182(a), 12181(7)(F). Section 504, which applies to entities receiving federal financial assistance, similarly provides, "No otherwise qualified individual with a disability … shall, solely by reason of her … disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination[.]" 29 U.S.C. § 794(a).

For purposes of Plaintiffs' claims, Title III and Section 504 are "similar in substance ... and cases interpreting either are applicable and interchangeable." Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 1998) (quotations omitted). As this Court has put it, "[f]or analytical purposes, each is identical." Loye, 647 F. Supp. 2d at 1086.

Plaintiffs' statutory claims differ only with respect to the form of relief available under each Act. Although Title III of the ADA contemplates injunctive relief, a private party is prohibited from seeking monetary damages under this section of the ADA. 42 U.S.C. § 12188(a); Stebbins v. Legal Aid of Ark., 512 Fed. Appx. 662, 663 (8th Cir.

2013) ("Title III of the ADA does not provide for private actions seeking damages"). Conversely, the RA allows a plaintiff to seek compensatory damages in addition to injunctive relief. Meagley v. City of Little Rock, 639 F.3d 384, 388 (8th Cir. 2011). However, in order to recover money damages, Plaintiffs must make a "heightened showing" that Mayo's discrimination was intentional. Id. at 388-89.

## II. PLAINTIFFS' CLAIMS FAIL AT THE *PRIMA FACIE* STAGE BECAUSE THE UNDISPUTED MATERIAL FACTS CONFIRM PLAINTIFFS WERE NEVER DENIED THE BENEFITS OF MAYO'S SERVICES.

To maintain their ADA/RA claims, Plaintiffs must first establish a *prima facie* case by showing: (1) they are qualified individuals with disabilities; (2) they were denied the benefits of Mayo's services; and (3) the denial was based on their disabilities. Loye, 647 F. Supp. 2d at 1087. While Mayo does not dispute that Plaintiffs are qualified individuals with disabilities, their claims fail because they cannot show "a triable issue as to elements 2 and 3." Id. "To survive summary judgment, therefore, [P]laintiffs must come forward with facts from which a jury could find [Mayo] denied them the benefit of its services, or otherwise discriminated against them, because they are deaf." Id.

Plaintiffs' theory is that Mayo denied them the benefits of Mayo's services by failing to provide "appropriate auxiliary aids and services, including qualified ASL interpreters who would interpret accurately and effectively, necessary to ensure effective communication with Plaintiffs." (Compl. ¶¶36, 40.)

The ADA and RA provide that an entity may engage in discrimination by failing to furnish "auxiliary aids or services" sufficient to allow disabled individuals to benefit from entity's services. 42 U.S.C. § 12182(b)(2)(A)(iii); 28 C.F.R. § 36.303(c); 45 C.F.R.

706694.v5

§ 84.52(d)(1). For deaf individuals, the regulations promulgated under each Act do not limit appropriate "auxiliary aids and services" to mean "qualified interpreters" alone, but to also include, among other alternatives, "notetakers, ... written materials, ... assistive listening devices, ... [and] other effective methods of making aurally delivered materials available to individuals with hearing impairments." 28 C.F.R. § 36.303(b)(1); accord 45 C.F.R. § 84.52(d)(3) (defining "auxiliary aids" as including "brailed and taped materials, interpreters, and other aids for persons with impaired hearing or vision").

Importantly, both the ADA/RA regulations and the Eighth Circuit recognize that medical providers are **not** required to provide auxiliary aids that guarantee "**the identical result** … for handicapped and nonhandicapped persons," but instead, aids that "afford handicapped persons equal opportunity to obtain the same result [or] to gain the same benefit." 45 C.F.R. § 84.4(b)(2) (emphasis added); accord Loye v. Cnty. of Dakota, 625 F.3d 494, 499 (8th Cir. 2010), cert. denied 131 S. Ct. 2111 (2011) . Likewise, providers are **not** required to honor a patient's preference in order to be compliant:

> **Based upon a careful review of the ADA legislative history, the [DOJ] believes that Congress did not intend under title III to impose upon a public accommodation the requirement that it give primary consideration to the request of the individual with a disability.**

28 C.F.R. pt. 36, App. C (emphasis added).

In light of the foregoing, Plaintiffs cannot survive summary judgment based on their theory that Mayo denied them the benefit of its services by providing an allegedly unqualified interpreter for three reasons. First, Plaintiffs have not shown a fact issue exists regarding Rasmusson's qualifications. Second, the record shows Plaintiffs were

able to effectively communicate with Saunders' providers through other auxiliary aids. Third, Plaintiffs cannot direct the Court to a single instance when they were denied the benefits of Mayo's services as a result of ineffective communication by Rasmusson.

> 1. *Plaintiffs have not met their burden of demonstrating a fact issue exists as to whether Rasmusson was a "qualified interpreter."*

Plaintiffs' entire case is premised on their allegation that Rasmusson was not a "qualified interpreter," as that term is defined under the ADA/RA regulations. ADA regulations define "qualified interpreter" as meaning "an interpreter who ... is able to interpret effectively, accurately and impartially both receptively and expressively, using any necessary specialized vocabulary." 28 C.F.R. § 36.104. The RA likewise contemplates use of interpreters as an auxiliary aid, though the RA regulations do not address (or require) qualification. See 45 C.F.R. § 84.52(d).

> i. *Rasmusson's certification level is not probative.*

Plaintiffs cite Rasmusson's NAD Level III certification, as opposed to Level IV-V certification, as evidence Rasmusson was not a qualified interpreter. However, in enacting the ADA/RA regulations, both the Department of Justice and Department of Health and Human Services expressly declined to impose **any** certification requirement for sign language interpreters. 28 C.F.R. Pt. 36 (2011) ("on review of this issue, the [DOJ] has decided against imposing a certification requirement under the ADA"); DHHS Settlement Agreement with Advanced Dialysis Ctr., OCR Trans. No. 10-119670 (Jan. 18, 2012) ("certification is not required in order for an interpreter to be 'qualified'" under the

RA).[15] Moreover, as Plaintiffs' own expert noted, "**no certification [level] guarantees that the interpreter is qualified for any assignment**." (Shepard-Kegl Report at 92 (emphasis added).)

Based on their own expert's opinion, and in light of the DOJ/DHHS's acknowledgement that the ADA and RA do not impose any certification requirement, Plaintiffs cannot overcome summary judgment by relying on Rasmusson's NAD Level III certification as evidence she was unqualified.

> ii.    *Plaintiffs cannot manufacture an issue of fact by relying on the handful of other complaints Mayo received during this timeframe.*

As is apparent from their motion to exclude one of Mayo's experts, Bruce Adelson, Plaintiffs also believe Rasmusson's purported lack of qualification is evidenced by Mayo's receipt of five other complaints regarding ASL interpreters during the same timeframe Saunders received prenatal treatment. (Pltf. Memo. at 4-5 [Docket No. 36].) However, out of those five complaints, only one references Rasmusson. (See Gilbert Aff., Ex. D [Docket No. 37].) Of the remaining four, one identifies Bruns, and the other three do not identify any interpreters—whether staff, supplemental, or freelance—by name. (See id.)

Plaintiffs present these complaints to the Court in a vacuum, rather than in a manner that could allow any reasonable factfinder to conclude Rasmusson was not a qualified interpreter. The record shows that from January 2010 through January 2011,

---

[15]The DHHS Settlement Agreement is accessible online at http://www.hhs.gov/ocr/civilrights/activities/agreements/settlement_agreement.pdf (Last accessed Dec. 5, 2014).

Rasmusson interpreted for **<u>over 700</u>** patient and employee appointments. (Rasmusson Ex. 5; Winter Decl. ¶6.) Even assuming all three complaints where the interpreter was not named were about Rasmusson, the net result is four complaints in a 13-month period. Put differently, **one out of every 175 appointments** yielded a complaint from an unsatisfied recipient of Rasmusson's services. (Winter Decl. ¶7.) No reasonable factfinder could conclude, based on such a small percentage, that Rasmusson lacked the qualifications necessary to interpret in a medical setting.

> ### iii. *Plaintiffs' complaints that Saunders had to slow down and repeat her signing for Rasmusson, who was not a "native" signer like Saunders, does not suggest Rasmusson was unqualified.*

Plaintiffs' final source of "evidence" that Rasmusson was unqualified is their testimony regarding their personal complaints with Rasmusson's communication style. But notably lacking from Plaintiffs' testimony are any specific examples of miscommunication or errors in Rasmusson's interpretation that prevented Plaintiffs from effectively communicating with Saunders' medical providers, which is precisely what Plaintiffs must ultimately prove to sustain their claims. 28 C.F.R. § 36.303(c); 45 C.F.R. § 84.52(d)(1).

Instead, Plaintiffs' complaints focus on the inconveniences and annoyances that Rasmusson's signing caused them. For example, Saunders testified she was "not comfortable" with Rasmusson because she "was having to ask for clarification and ask for things to be repeated." (Saunders 26:19-25.) Saunders further complained she "had to slow down [her] signs for the interpreter, [which] isn't something [she] normally [has to]

26

do." (Id. 27:2-6.) Saunders' deposition testimony is consistent with her one and only written complaint to Mayo, when she wrote to Voller on 12/16/10:

> I have had to slow down or change my way of signing to meet their ability to understand.
>
> * * *
>
> I only wish to be respect[ed] with what I am comfortable with. And its also my right[] to have [a] proper interpreter who's able to understand me clearly without stopping me to repeat or for me to slow or make sure they understand what I'm saying.

(Id. Ex. 4.) This is the same issue Saunders identified in her January 2011 complaint to CSD, when she informed (her now attorney) Gilbert that she was upset Hughes "asked [her] to make due [sic] with [Rasmusson] by signing slower and at a lower level (or more simple level) of [ASL] so that Ms. Rasmussen [sic] could understand." (Saunders Ex. 7 at Saunders000011.)

Overall, Saunders' demanding expectations are perhaps best summarized by Plaintiffs' expert:

> **[T]o be recognized as the bright, competent, and mature woman that she is[, Saunders] must be able to speak directly to people in ASL or have an interpreter that can provide her a highly sophisticated interpretation from English ... to do [Saunders] justice in interpreting her signing.**

(Shepard-Kegl Report at 69 (emphasis added).) However, Saunders' purported desire "[t]o be recognized as [a] bright, competent, and mature woman" is not what the law requires. The law requires providers such as Mayo to provide auxiliary aids that enable hearing-impaired patients to communicate effectively with their caregivers. The annoyance Saunders may have experienced in having to slow down or repeat her signing, while frustrating for Saunders, is not the type of inconvenience that could allow a

27

reasonable jury to conclude Mayo denied Saunders access to its services when Mayo infrequently sent Rasmusson to Saunders' appointments.

The record reflects Rasmusson obtained her degree and worked as a staff interpreter for **over 20 years** before being hired by Mayo in 2007. (Rasmusson 8:11-9:10, 20:16-25, 21:13-23; Hughes 50:13-17.) During that timeframe, Rasmusson also worked as a freelance medical interpreter for CSD, one of the same agencies Mayo contracted with for the freelancers Saunders later preferred. (Rasmusson 24:11-25:1; Saunders Ex. 4 at DEF266.) Further, Rasmusson had unusual expertise, in that **she worked as licensed practical nurse for ten years before becoming an interpreter**, which provided her with medical familiarity most interpreters do not possess. (Rasmusson 6:22-8:8, 10:3-12:3.)

In total, Rasmusson spent over 30 years of her professional career in the medical setting before interpreting for the three appointments Plaintiffs complain of in December 2010 and January 2011. While she may not have provided the "highly sophisticated interpretation" Saunders preferred from a native-level signer, the record simply does not support Plaintiffs' claim that Rasmusson was unqualified. For this reason, Plaintiffs have not met their burden of establishing their *prima facie* case, and their claims must be summarily dismissed.

> 2. *Even if Plaintiffs could establish an issue of fact exists as to Rasmusson's qualifications, Plaintiffs were able to effectively communicate with Saunders' providers through alternative auxiliary aids.*

Even assuming Plaintiffs could establish Rasmusson was unqualified, Plaintiffs' claims still fail because the undisputed evidence confirms Plaintiffs were able to access Mayo's services through alternative auxiliary aids.

As noted above, "qualified interpreters" are not the only form of appropriate auxiliary aid that a provider need offer to hearing-impaired patients and companions. See 28 C.F.R. § 36.303(b)(1); 45 C.F.R. § 84.52(d)(3). Indeed, "**[n]either [case law] nor the regulations ... establish a *per se* rule that sign language interpreters are necessary in hospital settings.**" Proctor v. Prince George's Hosp. Ctr., 32 F. Supp. 2d 820, 827 (D. Md. 1998) (emphasis added). "In fact, the Supreme Court has held that sign language interpreters are not required when lip reading, or by extension other accommodations, are sufficient." Id. (citing Bd. of Educ. v. Rowley, 458 U.S. 176 (1982)). "The auxiliary aid requirement is a flexible one," Feldman v. Pro Football, Inc., 419 Fed. Appx. 381, 392 (4th Cir. 2011) (quoting 28 C.F.R. pt. 36, app. C), and "the ultimate decision as to what measures to take rests with the public accommodation." 28 C.F.R. § 36.303(c)(1)(ii).

The undisputed evidence establishes that in addition to being provided an interpreter at **every** appointment for which they requested one, Plaintiffs were also able to effectively communicate with Saunders' providers through at least two other appropriate auxiliary aids: (1) exchanging written notes with the providers; and (2) interpreting by Branden, who wore hearing aids and, by Plaintiffs' own admission, is a skilled lipreader.

*i. Alternative aid: written notes.*

As another court has recognized, "[a] deaf patient may obviously have a strong command of the English language—and would be able to participate adequately in … her own treatment through the use of written notes." Godbey v. Iredell Mem'l Hosp., Inc., 2013 U.S. Dist. LEXIS 117129, at *23 (W.D.N.C. Aug. 19, 2013), aff'd 578 Fed. Appx. 317 (4th Cir. 2014). This was true for Saunders. According to Plaintiffs' expert, while

Saunders' English "isn't native, ... it is functional." (Shepard-Kegl Report at 64.) In fact, Saunders' "reading and writing of English are ... **above average** for the d/Deaf population." (Id. at 69 (emphasis added).) Their expert believes Saunders' English "is good and her reading is adequate for most everyday purposes." (Id. at 67.) The expert further opines Saunders reads English at least at a sixth-grade level, "**with potential to read higher when the subject matter is familiar,**" such as in the **medical field, where Saunders' "vocabulary is strong**." (Id. at 65, 69 (emphasis added).)

The evidence establishes Saunders was able to communicate effectively with her providers by exchanging written notes. In fact, Saunders did this by choice. For her July 2011 appointment, Saunders informed Mayo she did not want an interpreter. (Saunders 84:4-14.) Instead, in her own words, Saunders "just wrote notes back and forth with the doctor as a form of communication." (Id. 85:3-5.) Plaintiffs do not allege Saunders was denied access to Mayo's services when utilizing this alternative means of communication, which is itself a form of auxiliary aid approved by ADA/RA regulations. See 28 C.F.R. § 36.303(b)(1) (including "notetakers" and "written materials" among appropriate auxiliary aids).[16]

*ii.    Alternative aid: interpretation by Branden.*

During her last prenatal appointment at Mayo (01/04/11), Saunders did not want to communicate through Rasmusson, who remained present at the physician's request, so Saunders instead relied on Branden do the interpreting between the physician and herself.

---

[16] Saunders' ability to effectively communicate using written English is further evidenced by the articulate e-mail she sent Voller. (See Saunders 45:9-14, Ex. 4.)

706694.v5

(Saunders 69:5-7, 71:11-13.) Mayo's Communication Assistance Policy contemplated this possibility, so long as the family member's interpretation did not "compromise the effectiveness of care." (Rasmusson Ex. 6.) When asked whether she believed any miscommunication resulted from Branden's interpretation, Saunders testified, "No. **I've never had issues with him.**" (Saunders 69:8-11 (emphasis added).)

Moreover, although Plaintiffs both vaguely alleged Rasmusson occasionally made "mistakes" when interpreting at Saunders' appointments, they both confirmed that no harm resulted from such mistakes because Saunders could rely on Branden to clarify. Saunders testified that when Branden "could see that there were mistakes, ... he would clarify and he would help and assist [her]." (Saunders 40:11-15.) Likewise, if Saunders "didn't understand the interpreter, [she] would defer to [Branden] and he would clarify." (Id. 40:15-17.)

The ADA and RA require providers to provide appropriate auxiliary aids to allow for effective communication. That is precisely what Mayo provided, in the form of qualified interpreters, written exchanges, and allowing Saunders to rely on Branden. Based on these facts, no reasonable factfinder could find Mayo liable for denying Plaintiffs the benefits of its services.

>    3.    *Plaintiffs cannot direct the Court to a single instance where they were denied the benefits of Mayo's services as a result of a breakdown in communication caused by Rasmusson.*

During her deposition, Saunders testified she was never denied any service at Mayo. (Saunders 87:14-15.) Instead, she believes Mayo should be held liable for not providing her with "[m]edically certified interpreters." (Id. 87:16-24.) In Saunders' view,

Mayo violated the law by utilizing "interpreters [that] didn't have medical certification to provide services to interpret ... to meet [her] needs of communication." (Id. 91:5-10.) Saunders believes Mayo was obligated to provide her with "an interpreter that [she was] comfortable with," and ideally, her "preferred interpreter." (Id. 94:7-20, 95:5-9; accord id. 17:11-13 ("And I just always felt I had a right to request my preferred interpreters in general").) But as discussed above, Saunders' demanding expectations are not in line with the law. See, e.g., Colo. Cross-Diability Coalition v. Women's Health Care Assocs., P.C., 2010 U.S. Dist. LEXIS 119955, at *7-8 (D. Colo. Oct. 25, 2010) (granting motion to dismiss and holding provider was not required to provide patient's preferred interpreter because "[t]he selection of an interpreter is to be made by the provider.").

Plaintiffs cannot point to a single alleged miscommunication or error by Rasmusson that caused them to be denied the benefits of Mayo's services. Because Plaintiffs cannot meet their burden of demonstrating a genuine issue of fact exists as to whether they were denied the benefits of Mayo's services, or that such denial was based on their disabilities, their *prima facie* case fails on the second and third elements, and their claims should be dismissed.

## III. PLAINTIFFS' CLAIMS FAIL BECAUSE THEY CANNOT MEET THEIR BURDEN OF SHOWING THEY ARE ENTITLED TO EITHER FORM OF RELIEF AVAILABLE UNDER THE ADA OR RA.

Because Plaintiffs' claims fail at the *prima facie* stage, the Court need not continue its analysis any further. However, for the sake of thoroughness, Mayo notes that summary judgment is warranted for the additional reason that Plaintiffs cannot meet their burden of showing they are entitled to injunctive relief or compensatory damages.

706694.v5

## A.     Plaintiffs Lack Standing To Seek Injunctive Relief.

Plaintiffs seek injunctive relief under both Title III and Section 504. (Compl. ¶2.) However, to survive summary judgment, Plaintiffs must show they have standing. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992).

To establish standing for injunctive relief, Plaintiffs must first demonstrate they will suffer an injury in fact which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. <u>Id.</u> With respect to this burden, "[p]ast exposure to [alleged] illegal conduct does not in itself show a present case or controversy regarding injunctive relief [when] unaccompanied by any continuing, present adverse effects." <u>O'Shea v. Littleton</u>, 414 U.S. 488, 495-96 (1974).

As recognized in similar cases brought against other medical providers by deaf patients, Plaintiffs' claims for injunctive relief fail because they cannot demonstrate that unless injunctive relief is granted, they will suffer an actual, concrete and particularized injury, as opposed to an injury that is merely speculative or imagined. <u>See</u>, <u>e.g.</u>, <u>Schroedel v. N.Y. Univ. Med. Ctr.</u>, 885 F. Supp. 594, 598-599 (S.D.N.Y. 1995) (granting Rule 12 motion); <u>Aikins v. St. Helena Hosp.</u>, 843 F. Supp. 1329, 1333-34 (N.D. Cal. 1994) (same).

Here, Plaintiffs have "shown neither that [they are] likely to use [Mayo] in the near future, nor that [Mayo is] likely to discriminate against [them] when [they do] use the hospital." <u>Aikins</u>, 843 F. Supp. at 1333. As residents of Faribault, Plaintiffs are unlikely to seek emergency services at Mayo, which is approximately one hour away. (Saunders 7:18-21, 61:15-17.) Over three years have passed since Saunders last sought

medical care at Mayo in July 2011, and Branden has never been a Mayo patient. (Saunders 109:13-19; Branden 98:15-19.) Furthermore, none of the purported discriminators (i.e., the staff interpreters about whom Plaintiffs complained, Rasmusson and Bruns, or their supervisors, Hughes and Voller) are still employed at Mayo in Rochester.[17] (Branden 98:20-99:2.)

Moreover, to the extent Plaintiffs' claims are premised on their belief that Mayo should have only utilized staff interpreters with certification higher than NAD Level III (despite that federal regulators expressly rejected imposing **any** certification requirements under the ADA/RA, as discussed infra), both of Mayo's current staff ASL interpreters are NAD Level V certified. (Branden 99:3-5.) In fact, one of Mayo's existing staff interpreters is Danella Bohland, a supplemental interpreter Saunders preferred. (Saunders 54:13-18, 79:9-11, 85:13-16.)

Thus, even assuming Saunders could establish a reasonable likelihood of future treatment at Mayo (which she cannot), it is undisputed that Mayo has "amended its policy of providing translation services in ways adequate to prevent a recurrence of the alleged violation, namely, by having qualified interpreters more readily available." Godbey, 2013 U.S. Dist. LEXIS 117129, at *26. Therefore, without any "reasonable expectation for the challenged conduct to start up again, [Plaintiffs'] request for injunctive relief is moot." Id. (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000)).

---

[17] Hughes is retired (Hughes 8:13-14), Rasmusson's employment ended in January 2012 or 2013 (Rasmusson 42:5-6), Bruns' employment ended in January 2013 (Bruns 24:20-21), and Voller works in Eau Claire, Wisconsin. (Voller 4:4-10).

706694.v5

When asked whether she had any basis to believe that anything about Mayo's current ASL interpreter program needed changing, Saunders testified, "**I don't know.**" (Saunders 103:22-25.) Indeed, the record before the Court does not reflect any purported ongoing discrimination by Mayo towards Plaintiffs or any other hearing-impaired patients. Therefore, Plaintiffs are unable to establish that they face a real and immediate threat of future harm from Mayo, rather than a mere conjectural or hypothetical threat. See Schroedel, 885 F. Supp. at 599 (concluding analogous facts did not support a finding of a real and immediate threat of repeated injury sufficient to confer standing for injunctive relief).

Because Plaintiffs lack standing to seek injunctive relief, their ADA claim must be dismissed its entirety, and their RA claim must likewise be dismissed to the extent it is premised on their request for injunctive relief.

**B.**   **Plaintiffs Cannot Seek Compensatory Damages Because They Fail To Meet Their Heightened Burden Of Showing Intentional Discrimination.**

Once Plaintiffs' claims for injunctive relief are dismissed, all that remains of their suit is their request for compensatory damages under Section 504 of the RA. However, this claim, too, is subject to dismissal because Plaintiffs fail to meet their burden of presenting evidence suggesting Mayo intentionally discriminated against them, which is the "heightened showing" Plaintiffs must make in order to recover money damages. Meagley, 639 F.3d at 388-389.

In order to survive a Rule 56 motion on the issue of intent, Plaintiffs must present evidence demonstrating Mayo's "deliberate indifference to the strong likelihood that

pursuit of its questioned policies [would] likely result in a violation of federally protected rights." Id. at 389. Put differently, this higher burden requires Plaintiffs to prove Mayo "was deliberately indifferent to the rights secured to [Plaintiffs] by the ... [RA]." Id.

Here, the Court will find a distinct difference between the line of cases involving providers that failed to provide **any** interpreter, and those cases where the evidence demonstrates the providers attempted to accommodate the plaintiffs' requests. Under the latter line, an issue of fact sometimes exists as to whether the provider acted with deliberate indifference when refusing to provide an interpreter altogether. See, e.g., Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 277-78 (2d Cir. 2009). Conversely, courts that have addressed fact patterns similar to the one before this Court, have reached the opposite conclusion.

For example, the Eleventh Circuit held a RA claim failed where the evidence showed the defendant-hospital contacted an interpreter but was unable to coordinate the interpreter's schedule with the patient's multi-day stay. Saltzman v. Bd. of Comm'rs of the N. Broward Hosp. Dist., 239 Fed. Appx. 484, 488 (11th Cir. 2007). As here, the hospital had an accommodations policy containing "specific provisions for treating hearing-impaired patients," including interpreting services. Id. at 485-86. Noting that "[n]egligence, even if gross, cannot constitute deliberate indifference," and that "[f]or conduct to be deliberately indifferent, there must be both knowledge of likely harm and failure to act on the part of a policymaker," the Circuit Court concluded:

> Construing the facts in the light most favorable to the [plaintiffs], no reasonable juror could find that [defendant's] conduct constituted intentional discrimination. [Defendant] had a policy in place for assisting

36

hearing-impaired patients[.] There is no evidence that any [Defendant] policymaker intended or expected hearing impaired people would be discriminated against in their hospital.

Id. at 487-488.

Mayo likewise maintained a policy providing for free interpreters to deaf patients and companions. (Rasmusson Ex. 6.) In fact, Mayo provides such interpreters for thousands of patient appointments each year, including Plaintiffs. (Rasmusson Ex. 5.) Indeed, over many years, Plaintiffs were provided an interpreter **every** time they requested one. And, for many years, Mayo was able to provide Plaintiffs with the interpreters they preferred.

Additionally, Plaintiffs present no evidence that Hughes or Voller, are policymakers, much less that they are policymakers who intended or expected Plaintiffs would be discriminated against after Plaintiffs raised concerns about staff interpreters. Quite to the contrary, both supervisors continuously sought to have a further dialogue with Plaintiffs to address Plaintiffs' concerns, which Plaintiffs repeatedly ignored.

Finally, as in Saltzman, Mayo "had in place a variety of other auxiliary aids for nonverbal communication[, including] fingerspelling, ... written communication, and other means to communicate with [Plaintiffs]." Saltzman, 239 Fed. Appx. at 488. As the Eleventh Circuit concluded,

> **While these communications may not have been as effective as [Plaintiffs] would have preferred, the fact that [Mayo's] staff would offer such a broad range of auxiliary aids, while seeking the services of a qualified interpreter, support the record's clear showing that [Mayo] did not intend to discriminate against [Plaintiffs]** or any other hearing impaired person because of their disability, and there is no evidence that [Mayo's] officials believed there was a likelihood of such discrimination.

37

Id. (emphasis added); accord Godbey, 2013 U.S. Dist. LEXIS, at *25, aff'd 578 Fed. Appx. 317 (4th Cir. 2014). Ultimately, as in Saltzman, "**the undisputed facts show that [Mayo] took seriously its duty to accommodate hearing-impaired patients, even if in this particular instances its efforts to find an interpreter**," at least in Plaintiffs' opinion, "**came up short.**" Saltzman, 239 Fed. Appx. at 488 (emphasis added).

Because the undisputed material facts will not allow a reasonable factfinder to conclude Mayo intentionally discriminated against them, Plaintiffs' claim for compensatory damages under the RA fails and should be dismissed.

## IV.    BRANDON LACKS SEPARATE STANDING.

Plaintiffs cannot direct the Court to a single place in the record where Branden alleges that, based on his own disability or his association with Saunders, he was denied the benefits of Mayo's services. Instead, the record reflects that Branden wore hearing aids to Saunders' appointments and was purportedly able to monitor the Mayo interpreters' signing for Saunders.

As recognized very recently in an Eleventh Circuit decision, a companion only has standing if he "was personally discriminated against or denied some benefit because of [his] association with a disabled person." McCullum v. Orlando Reg'l Healthcare Sys., 768 F.3d 1135, 1142 (11th Cir. 2014). Given the absence of "even any allegations that [Mayo] excluded, denied benefits to, or discriminated against [Branden] because of [his] association with [Saunders]," Branden "lack[s] standing to sue under the RA and ADA," and as a result, his claims are properly dismissed. Id. at 1145.

## **CONCLUSION**

For the foregoing reasons, Mayo respectfully asks the Court to grant its motion, dismissing Plaintiffs' case in its entirety.

Dated: December 15, 2014.

FELHABER LARSON

By: s/ Penelope J. Phillips
    Penelope J. Phillips, #200876
    Randi J. Winter, #0391354
    220 South Sixth Street, Suite 2200
    Minneapolis, Minnesota 55402
    Telephone: (612) 339-6321
    pphillips@felhaber.com
    rwinter@felhaber.com

    Joanne L. Martin, #0388453
    Mayo Clinic
    200 First Street S.W.
    Rochester, MN 55905
    Telephone: 507-284-4266
    martin.joanne@mayo.edu

ATTORNEYS FOR DEFENDANT MAYO CLINIC