# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Case No.: 13-CV-1972 (JNE/JJG)

Priscilla Saunders and
Jason Branden,

       Plaintiffs,

v.

Mayo Clinic,

       Defendant.

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MAYO'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Priscilla Saunders ("Saunders") and Jason Branden ("Branden" and collectively as "Plaintiffs") have sued Defendant Mayo Clinic ("Mayo") for failing to provide qualified interpreters for communications with Mayo's healthcare providers during Saunders' prenatal care and neurological appointments.

Mayo has now made a motion for summary judgment asking the Court to dismiss all of Branden's and Saunders' claims. In response, Branden and Saunders have come forward with evidence showing Mayo discriminated against them based on their disability by denying them equal access to the benefits, programs and services provided to non-disabled patients and companions: Mayo did not provide a qualified interpreter for Branden and Saunders even though they made multiple requests for one and Mayo knew they needed a qualified interpreter. Mayo also denied them the opportunity to secure a qualified interpreter so they could continue with Plaintiffs' birthing plan to deliver their child via vaginal-birth-after-cesarean (VBAC). "In a case such as this it is especially important to consider the complainants' testimony carefully because 'the individual with a disability

1

is most familiar with his or her disability and is in the best position to determine what type of aid or service will be effective.'" *Argenyi v. Creighton Univ.*, 703 F.3d 441, 446 (8th Cir. 2013) (citing U.S. Dep't of Justice, The Americans with Disabilities Act Title II Technical Assistance Manual, at II–7.1100 (1993)).

Branden and Saunders have demonstrated that there is sufficient evidence to show Mayo's two staff interpreters were not qualified and communication was not effective at Plaintiffs' medical appointments. Branden and Saunders have also demonstrated that there is sufficient evidence to show Mayo acted with deliberate indifference, the standard necessary to recover damages under Section 504 of the Rehabilitation Act ("RA").

Finally, Mayo's arguments that Branden and Saunders lack standing fails because 1) both Plaintiffs require injunctive relief for their future medical services at Mayo and 2) Branden is protected by the Americans with Disabilities Act ("ADA") and RA as a disabled companion.

## I.  <u>STATEMENT OF THE FACTS</u>

### A.  Parties

Plaintiffs Priscilla Saunders and Jason Branden are deaf individuals who use American Sign Language to communicate. (Branden Aff. ¶1; Saunders Aff. ¶1.) Saunders was born deaf, does not read lips, does not hear or understand English words even with hearing aids, and does not speak in a spoken language. (Saunders Aff. ¶2.) Saunders can read and write English at a sixth-grade level. (Saunders Aff. ¶3.) Since 2001, Saunders has been a stay-at-home mother. (Saunders Aff. ¶4.)

Branden was also born deaf.  (Branden Aff. ¶2.)  He attended school with the aid of a sign language interpreter.  (Branden Aff. ¶3.)  When he used to wear hearing aids, the aids assisted in his ability to hear environmental sounds but did not assist him in his ability to distinguish spoken words.  (Branden Aff. ¶¶4–5.)  Although Branden has limited ability to read lips, he cannot understand spoken language communications by relying on lip reading and hearing aids alone.  (Branden Aff. ¶¶6–7.)  His lip-reading ability is further impaired when a speaker has a foreign accent or does not look directly at him.  (Branden Aff. ¶7.)

Neither Saunders nor Branden are able to use a telephone, listen to talk radio, or watch television without captions.  (Branden Aff. ¶8; Saunders Aff. 5.)  Both Saunders and Branden rely on qualified sign language interpreters for appointments with non-signing hearing professionals.  (Branden Aff. ¶9; Saunders Aff. ¶6.)

Mayo is a 3.1 billion dollar healthcare organization[1] located in Rochester, Minnesota.  Rochester, Minnesota is the third largest city in Minnesota, smaller only than Minneapolis and St. Paul.[2]  Mayo, through its agents and representatives, knew that Saunders and Branden were deaf and used American Sign Language to communicate.

---

[1] Total revenue for fiscal year 2010 reported to IRS and made public through GuideStar. *GuideStar*  ttp://www.guidestar.org/organizations/41-6011702/mayo-clinic-rochester.aspx (last visited Jan. 5, 2015).
[2] *United States Census Bureau*, U.S. Dep't Commerce (2010), http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk.

(Hughes 88:3–15, 90:22–91:3.)[3]  Mayo accepts federal dollars through federal insurance programs including Medicare and Medicaid.  (Voller 20:12-20.)

**B.    Mayo's Language Department Manager and Supervisor**

Mayo Clinic operates an eighty-person language department staff with an operating budget of two million dollars.  (Voller 16:3–13.)  Mayo provides twenty-five different language interpreting onsite, including sign language, and 150 spoken-language interpretations via telecommunication technology coordinated for Mayo's patients and companions.  (Hughes 18:3-19:21, 25:19–26:6.)  Among all other hospitals in Minnesota, Mayo Clinic sees the largest international pool of patients that require interpreting services. (Voller 21:9–18.)  In the event sign language interpreters are necessary to supplement the staff sign language interpreters, Mayo pays for them out of a separate general fund, which exceeds two million dollars.  (Voller 17:1–9, 18:7–18.)

From 2000 to 2013, the supervisor of the Language Department was Jane Hughes ("Hughes").   (Hughes 19:5-9, 32:5-14, 22:24-23:1.)   Hughes has no background in interpreting and does not know any language other than English.  (Hughes 40:4-7.)  Hughes is not an interpreter, does not know sign language, and does not belong to the profession. (Hughes 136:15–137:7, 141:21–25, 40:4–7.)  Hughes admits she does not know what a "qualified" interpreter is and cannot assess sign interpreters' skills.  (Hughes 141:21–25, 143:3–4.)

---

[3] All deposition transcripts are cited using the deponent's last name, followed by the specific page and line and/or exhibit reference(s) supporting the factual statement.

David Voller ("Voller"), Hughes's immediate supervisor, was the Operations Manager overseeing all International Affairs (which includes Mayo's interpreting department) from 2008 to 2013. (Voller 6:6-9; Hughes 24:19-25:8) Voller also does not know sign language and is not a trained interpreter in any language. (Voller 9:3-5.) Hughes shared all issues and concerns with Voller. (Voller 13:22-14:3; Hughes 188:9–10.) They worked very closely together while employed at Mayo. (*Id*.)

## C. Minnesota Standard For Qualified Medical Interpreters and Mayo's Staff Interpreters

Since 2004, Minnesota sign language interpreting agencies contracted with sign language interpreters certified at NAD IV or above for medical settings. (Juberian Aff. ¶¶8–10; Kenney Aff. ¶¶7–9; Wellumson Aff. ¶¶7–8.) In addition, by 2007, almost all major hospital systems in the state of Minnesota had established policies to prohibit the use of NAD III interpreters. (Macpherson Aff. ¶5–11.) In order to be a "qualified" medical interpreter, hospitals require sign language interpreters to hold one of the following interpreting certificates, which are current and up to date:

(a) A valid **NAD Level IV** or **V** Certificate from the National Association for the Deaf (NAD); or

(b) A valid Certificate of Interpretation (CI) and Certificate of Transliteration (CT) from the Registry of Interpreters for the Deaf (RID); or

(c) A Comprehensive Skills Certificate (CSC) from RID; or

(d) A valid National Interpreter Certification (NIC) certificates from the NAD-RID National Certification Council.

(Macpherson Aff. ¶6, 9.)

Shortly after securing her position as Language Department Supervisor, Hughes reached out to the State of Minnesota Department of Human Services for information about medical sign language interpreter certification requirements. (Hughes 129:21-131:3.) The record reflects that as far back as 2004, Mayo was aware of medical interpreting industry standards and stated a preference for NAD IV or higher in its employment description for medical sign language interpreter. (Hughes Ex. 3.)

### 1. *Mayo's Staff Interpreters*

Mayo's staff interpreters, Eileen Bruns ("Bruns") and Linda Rasmusson ("Rasmusson") held the NAD III "Generalist" Level certificate. (Bruns 10:12–13; Hughes 52:13–18; Rasmusson 34:12-24; Voller Ex. 7, Saunders000026)  Mayo employed one NAD V Master-level interpreter, Kathryn Dorsett ("Dorsett"), from 2005 to February 2010. (Dorsett 107:8–9.)

Brun's and Rasmusson's "generalist" certificate qualifies them to interpret for "*some* settings," but by Minnesota Department of Human Services standards, not for **medical** settings.  (Hughes Ex. 6, 7.)  Rasmusson had never served as a hospital staff interpreter prior to working for Mayo.  (Rasmusson 20:16-22:7.)

In February 2010, Mayo terminated Dorsett for reasons unrelated to her interpreting skills.  (Dorsett Aff. ¶ 35.)  Despite her poor skills, Mayo promoted Rasmusson from part-time to full-time staff interpreter because it could only afford to pay half the hourly rate of what qualified medical interpreters were earning at Twin City hospitals.  (Hughes 184:6–22, 185:4–18.)

### D. Saunders Tells Mayo On Multiple Occasions From 2005 to 2010 That She Cannot Understand Bruns and Rasmusson

The first time Saunders notified Mayo's Language Department about her difficulty understanding Bruns was 2004 or 2005. (Saunders 26:2–27:1, 27:2–22.) Rasmusson was a contract interpreter for Mayo at the same time. (Rasmusson 22:18–23:7.) After Saunders had tried to work with both interpreters, she called Mayo's Language Department and told them she could not understand Bruns and Rasmusson. (Saunders 26:18–27:22; Saunders Aff. ¶10.) She provided detailed information about specific problems in the communication including the interpreters' inability to understand fingerspelled[4] words, inability to follow the pace of her signing, and repeated requests for clarifications on both sides. (*Id.*) During one of Saunders' appointments in the fall of 2007, Mayo sent Dorsett to replace Bruns because Saunders could not understand Bruns. (Dorsett 33:19–34:12; Saunders Aff. ¶18.) After the appointment, Dorsett interpreted for Saunders when she contacted Mayo's Language Department again about the communication problems with Bruns. (Dorsett 34:15–22; Saunders Aff. ¶19.) Mayo sent Dorsett to most of Saunders' appointments and surgeries through January 2010. (Saunders Aff. ¶20.) Mayo also sent Bruns and Rasmusson from time to time as well. (Saunders Aff. ¶21.) When Mayo sent Bruns or Rasmusson to interpret for Saunders, she consistently complained that she could

---

[4]Fingerspelling" is the representation of the letters of a writing system, and sometimes numeral systems, using only the hands. http://en.wikipedia.org/wiki/Fingerspelling.

not understand Bruns and Rasmusson's sign language interpreting. (Saunders 42:22–43:4; Saunders Aff. ¶22.)

### E. Saunders contacts Mayo's Language Department on multiple occasions leading up to July 2010

Saunders and Branden learned they were pregnant with their second child in early 2010. (Branden 10:8–10.) Due to Saunders' seizure disorder and Plaintiffs' mutual desire to deliver their second child via vaginal-birth-after-cesarean (VBAC), Saunders' physician labeled her pregnancy as "high risk." (Compl. ¶ 12; Saunders 22:9–11, 35:24–36; Branden 22:10–12.) Saunders could find no other hospital within driving distance willing to perform a VBAC other than Mayo. (Saunders Aff. ¶26.) Saunders transferred her prenatal care to Mayo in July 2010. (Saunders 24:14–24.)

In February 2010, Dorsett was no longer employed at Mayo, and Mayo sent Rasmusson to interpret for three of Saunders' neurological appointments. (Saunders Aff. ¶23; Saunders 33:5–7; Rasmusson Ex. 5, DEF00286, 00290, 00295.) Saunders still could not understand Rasmusson's interpreting. (Saunders Aff. ¶23.) In July 2010, prior to transferring her prenatal care to Mayo, Saunders called Hughes again to stress that she could not understand Rasmusson and had observed Rasmusson could not understand her. (Saunders Aff. ¶25; Saunders 19:9–23; Branden, 21:13–19, 39:13–20; Hughes, 88:24–89:7.) Saunders explained that Rasmusson was slow and she could not understand Rasmusson. (Hughes 88:17–23.) She specifically explained that Rasmusson did not understand Saunders' fingerspelled words, she omitted information Saunders tried to convey to her doctor, and she had to ask for clarification repeatedly because she did not

understand Rasmusson. (Saunders 31:7–15, 42:17–43:31, 52:15–17; Saunders Aff. ¶11–12.) Conversely, Bruns and Rasmusson could not understand Saunders. (*Id.*)

Hughes stated Mayo would arrange for a different and qualified interpreter for Saunders' prenatal appointments. (Hughes 107:20–108:1.) Contrary to Mayo's portrayal of the facts, Mayo did not use Rasmusson because of the unavailability of qualified interpreters. Mayo maintained a policy that sign language users must use its staff interpreters unless the staff interpreters were not available. (Dorsett Aff. ¶19; Hughes 75:15-23; Voller 24:16-19.) Mayo's Language Department sought to hire contract or "freelance" interpreters only when their staff was already reserved or not available. (*Id.*)

From July 2010 through January 2011, Saunders set her prenatal appointments several weeks in advance to allow Mayo adequate time to contact a freelance interpreter. (Saunders Aff. ¶24.) Mayo's Language Department made the decision months in advance of Saunders' appointments to send their staff interpreters if they were available, despite Saunders' multiple requests for a qualified interpreter. For example, on August 9, 2010, email communication from Mayo's interpreter scheduler states:

> "*Priscilla Saunders () has appointments on Monday, September 13th at Charlton 3B. At this time, these are the only appointments on the calendar (for sign language requests). Do you want us to call CSD?*

To which the Assistant Manager replied,

> "*No – she will have to deal with our trained sign interpreter.*"

(Hughes Ex. 10, DEF 00281)

The record reflects Rasmusson subsequently had an appointment with another deaf patient during the same time on September 13th, resulting in a freelance interpreter assigned for Saunders and Branden. (Rasmusson Ex. 5, DEF00302.)

## F. Mayo Sends Rasmusson to Interpret For Four More of Saunders Appointments

On December 10, 2010, Mayo scheduled Rasmusson for Saunders' 37-week prenatal care appointment. (Hughes 107:9–17; Saunders 38:3–39:24.) After the appointment and at some point in December 2010, Saunders and Branden went down to the Language Department and told Hughes that the communication was difficult and ineffective. (Branden Aff. ¶18; Saunders Aff. ¶32; Branden 31:7–19; Hughes 109:7–110:5; Saunders 38:17–25.) Saunders explained that although Rasmusson was a nice person, this high-risk pregnancy required clear communication between Plaintiffs and Dr. Davies. (Saunders 51:13–25.) Branden told Hughes that he had to correct Rasmusson at several moments during the interpretation. (Branden Aff. ¶19; Branden 25:19–24.) He stated that Rasmusson omitted several portions of information. (Branden Aff. ¶20; Branden 32:7–14.) Branden also told Hughes that he could not understand all of the information communicated by Dr. Davies because the doctor had a British accent and did not articulate words on his lips for Branden to adequately read his lips. (Branden Aff. ¶23; Branden 29:11–16.)

On December 15, 2010, Saunders called Jane Hughes through video relay to explain the communication barriers with Rasmusson and to ask for a different interpreter for the

next appointment. (Saunders Aff. ¶30; Hughes 179:15–180:13; Ex. H at ¶5.) Hughes took Saunders' call, but was not willing to replace Rasmusson for Plaintiffs' next appointment. (Branden 36:16–18; Hughes 179:15–180:13; Saunders 52:1–6.) The next day, discouraged by the phone conversation with Hughes, Saunders emailed Voller. (Saunders 45:9–16; Hughes Ex. 10, DEF 00266.) She explained to Voller a detailed description of the communication barriers with Rasmusson and Bruns.

> "(Two) staff, Eileen and Linda, they're hard to understand they can't understand me, I have had to slow down or change my way of signing to meet their ability to understand. So I had clarify with Jane that I do not want those (two) staff."

(Hughes Ex. 10, DEF 00266.)

Voller refused to commit to securing a qualified interpreter for Plaintiffs' next appointment (Hughes Ex. 10, DEF 00267.) He invited Saunders and Branden to have *another* discussion about Bruns' and Rasmusson's poor interpreting skills. (*Id.*)

Mayo sent Rasmusson again to interpret for Plaintiffs' prenatal appointment on December 28, 2010. (Branden 48:4–9; Saunders 56:21–58:25.) Saunders and Branden attempted to communicate with Dr. Davies about the imminent high-risk VBAC. (Branden 48:14–20; Saunders 56:21–58:25.) Dr. Davies learned from Rasmusson's incorrect interpretation that Dr. Davies would strip Saunders' cervical membranes at the next appointment. (*Id.*) Both Saunders and Branden understood from Rasmusson's erroneous interpretation that they should prepare for delivery on January 4, 2011. (Branden 48:14–20; Saunders 58:7–59:10.)

**G. Plaintiffs' Last Prenatal Appointment with Mayo**

On January 3, 2011, Saunders contacted Mayo's prenatal clinic to request a qualified interpreter for Saunders' and Branden's final prenatal appointment and delivery of Branden's first child occurring the next day, January 4, 2011. (Branden 51:25–52:10; Saunders 63:10–64:2; *see* Hughes 189:22–190:23.)

On January 4, 2011, Voller told his staff Saunders was "**discriminating against (his) staff and we do not take lightly to that**." (Hughes Ex. 10, DEF 00272.) Hughes, Voller, and Rasmusson entered Saunders' prenatal exam room unannounced and waited for the nurse to bring in Saunders and Branden. (Branden 75:4–76:5; Hughes 197:3–202:21; Saunders 75:22–78:12.) When they entered the exam room, Saunders saw the three Language Department staff and asked them leave her appointment. (Saunders Aff. ¶36; Branden Aff. ¶29; Branden 76:13–77:13.) They refused to leave and Hughes physically blocked Saunders from exiting the room. (Saunders 79:12–80:4.) Distraught, Saunders finally was able to exit the room and wept in an adjacent waiting area for several minutes. (Saunders Aff. ¶37; Branden ¶30.) During what should have been their prenatal appointment, Voller, Hughes, and Rasmusson proceeded to question Branden about his and Saunders' difficulty understanding Rasmusson. (Branden 82:13–23, 83:9–84:23.) After they were done questioning Branden, Mayo still did not attempt to replace Rasmusson for the remainder of the prenatal appointment. (Branden 84:20–86:23, 87:22–88:8.) Dr. Davies knew about the interpreting concerns Plaintiffs had with Rasmusson. (Davies 21:11–13.)

Once Voller and Hughes left the room, Rasmusson proceeded to interpret for Branden and Saunders. Saunders and Branden asked Dr. Davies about stripping Saunders' cervical membranes to prompt labor. (Branden 86:16–22.) Dr. Davies denied stating at the last appointment that he would strip Saunders' cervical membranes and that there must have been miscommunication. (Branden 86:16–23; Saunders 67:10–70:2.)

Saunders and Branden feared for the potential miscommunication that would occur during their imminent high–risk VBAC labor and delivery with Mayo's staff interpreters. (Branden 68:1–8, 87:6–13; Saunders 67:10–70:2, 92:10–21; Branden Aff. ¶35; Saunders Aff. ¶45.) Voller expressed that at the time of delivery, they would not have the **"luxury"** of knowing who would be their interpreter (whether Bruns, Rasmusson, or freelance). (Hughes Ex. 10, DEF 00272.) Dr. Davies informed Saunders' referring doctor that Mayo would not guarantee a qualified interpreter for Saunders' and Branden's VBAC delivery. (Davies 21:21-22:15; Ex. D, MAYO 00010.)

At 40-weeks pregnant, Saunders was exhausted from pregnancy and stress compounded by the communication barriers at Mayo. (Saunders 72:10–21; Saunders Aff. ¶¶42, 44.) Saunders and Branden feared additional miscommunication would occur at the labor and delivery with Rasmusson or Bruns. (Saunders 73:12–17, 74:22–75:1; Saunders Aff. ¶46; Branden Aff. ¶36.) Aware that they could deliver their baby via cesarean section close to home with a qualified interpreter, Plaintiffs transferred to a different hospital two days before Saunders' surgery. (Saunders 72:10–23, 75:2–12.)

In January 2011, State of Minnesota Department of Human Services (DHS) representatives requested a meeting with Voller and Hughes to explain the certification

standards in Minnesota. (Voller 119:25–120:3; Hughes Ex. 10, DEF 00314–18.) DHS reminded Mayo of the certification standards for medical interpreters. (Voller 122:2–8; Hughes Ex. 10, DEF 00316–18.)

## H. Saunders returns to Mayo for neurological care

In June 2011, Saunders set an appointment to see her neurologist, Dr. Gregory Cascino for July 11, 2011. (Saunders Aff. ¶48.) Voller emailed Saunders' neurologist one month in advance of her July 11, 2011 appointment to state that Rasmusson and Bruns were "fully qualified and certified medical interpreters" despite Saunders' "*personal* expectations." (Hughes Ex. 10, DEF 00275.) He proceeded to dictate how Dr. Cascino must rely on Rasmusson's interpretation during the appointment. (*Id.*) On the day of the appointment, Doctor Cascino sent Rasmusson away. (Saunders Aff. ¶¶49–50; Hughes Ex. 10, DEF 00278.) Because Mayo did not provide a qualified interpreter, Saunders was limited to the only other option of writing back and forth for the entire duration of the appointment. (Saunders Aff. ¶50.) Writing back and forth inhibited Saunders' from experiencing natural communication in her fluent language of ASL. (*Id.*)

## I. Mayo does not seek options for providing effective communication through qualified medical interpreters

The record reflects multiple sign language interpreting agencies were available to Mayo to request qualified medical interpreters. (Donato Aff. ¶¶4, 7, 10; Juberian Aff. ¶¶5– 7, 13–15; Kenney Aff. ¶¶5–6, 12–13; Wellumson Aff. ¶¶4–6, 12–14.) Qualified medical interpreters were available within a one-hour drive to Mayo. (Donato Aff. ¶10; Juberian Aff. ¶14; Wellumson Aff. ¶13.) One of the largest agencies, ASLIS, indicates it was able

to fill more sign interpreter requests from December 10, 2010 to January 4, 2011 than any other time of the year. (Wellumson Aff. ¶15.) Each of these agencies hired qualified medical interpreters available for Mayo to contact for appointments. (Donato Aff. ¶4; Juberian Aff. ¶¶5, 8; Kenney Aff. ¶¶5, 7; Wellumson Aff. ¶¶4, 7.) Mayo did not seek to find medically qualified interpreters from more than one agency. (Hughes 95:14–24, 97:5–98:13..) Mayo claims to not have known about other agencies. (*Id.*) All agencies were available on the Department of Human Services' website and internet. (Juberian Aff. ¶7; Kenney Aff. ¶6; Wellumson Aff. ¶6; Donato Aff. ¶7.)

In 2010, Video Remote Interpreting was also an available option to Mayo for securing qualified medical interpreters. (Hughes 98:14–15, 203:22–204:12; Kenney Aff. ¶14.) Mayo did not pursue securing qualified interpreters through video remote interpreting because it could not decide on which vendor to use. (Hughes 98:14–15.)

## J. Evidence Shows Mayo Received Multiple Complaints from Deaf Patients Contemporaneous with Plaintiffs' Complaints

The record is replete with multiple complaints deaf patients experiencing the same or similar difficulty understanding Rasmusson and Bruns as Plaintiffs. (J. Doose Aff. ¶¶6–14; P. Doose Aff. ¶¶5–8; Slater Aff. ¶¶5–11, 13–16.)

Shortly after promoting Rasmusson to full time staff in February 2010, Mayo began to receive a number of complaints from deaf patients about both Rasmusson and Bruns. (Hughes 212:10–15, 94:15–95:2.) On April 21, 2010, Mayo received a complaint from a deaf patient about Rasmusson's inability to sign ASL words accurately. (Hughes 123:10–24, 124:23–125:1; Ex. 7, DEF 00364.) On August 30, 2010, a deaf patient complained

about his inability to understand the staff interpreters' "English–like" form of signing. (Hughes 211:18–25.) The third complaint, dated September 2, 2010, also complained about the difficulty understanding Rasmusson. (Hughes 125:22–24; Ex. 7, DEF 00379.) Mayo received a fourth complaint, dated September 14, 2010, from one of its own registered nurses about a patient's inability to understand Bruns and her inability to adjust to the patient's sign language. (Hughes 125:25–128:22; Ex. 7, DEF 00381.) The fifth complaint dated October 27, 2010 was a request for a "qualified" interpreter (to interpret at the next appointment) to provide effective communication. (Hughes 128:18–129:20; Ex. 7, DEF 00365.)

Plaintiffs are not the only ones that asked to have qualified interpreters for their appointments, which Mayo denied. Former patient Curt Slater delivered complaints to Hughes in the spring 2010 and again in 2012 about the staff interpreters and requested qualified interpreters. (Slater Aff. ¶9.) Mayo continued to send Bruns and Rasmusson to multiple subsequent appointments. (Slater Aff. ¶¶15–16.) Patricia Doose and Jerry Doose had the same experience. (J. Doose Aff. ¶¶13–14; P. Doose Aff. ¶¶9–11.)

## K. The State of Minnesota, Department of Human Services attempts to implement improvements to Mayo's Sign Language Interpreting Services

The Minnesota Department of Human Services Division of Deaf and Hard of Hearing Services (DHHS) also received multiple complaints contemporaneously with Saunders' and Branden's experiences in 2010-2011. (Bell-Slater Ex. 14; Ex. A Saunders000535, 000540.) On January 4, 2011 the DHHS Southern Region Manager, Tracy Bell requested a meeting with Hughes to discuss concerns raised by the deaf

community about the staff interpreters. (Hughes Ex. 10, DEF 00314.) At the February 2011 meeting between DHHS representative and Hughes and Voller, Bell provided examples of communication barriers the deaf community had brought to DHHS' attention. (Bell-Slater Ex 1, DEF00316-00318; Ex. C, Saunders000425.) Bell gave Hughes and Voller a model policy outlining certification standards for qualified medical interpreters in Minnesota. (Bell-Slater, Ex. 3, Saunders000016.)

## L. Mayo's Staff Interpreters Fail the National Interpreter Certification Exam

Mayo eventually required Bruns and Rasmusson to achieve a certification equivalent to Minnesota standards. (Hughes Ex. 8; Bruns 24:20–23; Rasmusson 27:16–22.) In December 2010, Hughes told Rasmusson that she must pass the National Interpreter Certification exam to remain employed at Mayo. (Hughes Ex. 8, DEF 00237.) The National Interpreter Certification exam replaced the NAD certification. (Rasmusson 28:14-17.) Hughes could have required immediate testing, but gave both Rasmusson and Bruns **two years** to prepare for and pass the test. (*Id.*) Bruns and Rasmusson continued to interpret for Mayo patients for over two years while complaints continued to pour in. (P. Doose Aff. ¶¶9–11; J. Doose Aff. ¶¶6, 13–14; Slate Aff. ¶¶9, 13, 16; *see also* Ex. A; Ex. B; Ex. C, Saunders000424.) Bruns and Rasmusson sat for the National Interpreter Certification exam in September 2012. (Rasmusson 147:7–20; Bruns 62:8–9, 63:3–4.) Bruns and Rasmusson received the notice that they had failed the National Interpreter Certification Exam at the end of December 2012. (Rasmusson 151:11–13; Bruns 62:10–17.) Mayo subsequently ended Bruns and Rasmusson's employment in January 2013. (Rasmusson 151:14–20; Bruns 24:20–25.)

## II. <u>MAYO'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiffs allege that Mayo violated Title III of the ADA and the Section 504 of the RA when it failed to provide effective communication for Plaintiffs' prenatal and Saunders neurological medical appointments. Mayo failed to provide effective communication in two ways. 1) Mayo did not provide a qualified sign language interpreter, and 2) Mayo did not provide alternative effective auxiliary aid to provide communication.

Mayo has now filed this motion for summary judgment asking the court to dismiss Plaintiffs' claims for three reasons: 1) Mayo never denied Plaintiffs the benefit of Mayo's services; 2) Branden and Saunders are not entitled to either injunctive relief or compensatory damages under the applicable federal laws; and 3) Branden lacks separate standing as a disabled companion.

Mayo's motion must be dismissed entirely because the facts in evidence regarding Mayo's conduct are in dispute and there are sufficient facts from which a reasonable jury could determine that Mayo violated both the ADA and RA. There is also overwhelmingly significant evidence that Mayo acted with deliberate indifference entitling Plaintiffs to seek injunctive relief and compensatory damages. Mayo's argument that either Plaintiff lacks standing must also be dismissed because both Plaintiffs intend to pursue prenatal services at Mayo and Saunders intends to return to her neurologist, Dr. Casino upon a favorable court order for injunctive relief. Additionally, Branden, as disabled companion, also has standing to pursue injunctive relief and compensatory damages under the ADA and RA.

### *Legal Standard for Summary Judgment*

Summary judgment is only appropriate when there is no genuine issue of material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 322 (1982).

Mayo, as the moving party, bears the initial burden of informing the Court of the basis for its motion, and demonstrating the absence of a genuine issue of material facts in dispute. *Celotex*, 477 U.S. at 323. Plaintiffs must then present sufficient evidence to establish the elements essential to the claims. *Id.* In establishing a genuine issue of material fact, plaintiffs may not "merely point to self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in [their] favor." *Argenyi v. Creighton University*, 703 F.3d 441, 446 (8th Cir. 2013) (quoting *Davidson & Assocs. v. Jung*, 422 F.3d 630, 639 (8th Cir. 2005)). However, while a "'party's own testimony is often self-serving,'" the mere fact that Branden and Saunders' "factual testimony is favorable to [their] legal claim does not render it incompetent." *Id.* (quoting *C.R. Pittman Const. Co., Inc. v. Nat'l Fire Ins. Co. of Hartford*, 453 Fed.Appx. 439, 44 (5th Cir. 2011)). Mayo then has the ultimate burden of demonstrating that no material facts are in dispute, which it cannot. *Oldham v. West*, 47 F.3d 985, 988 (8th Cir. 1995).

The Court must accept as true all facts properly supported by the record and view the facts of record in a light favorable to the non-moving party, drawing reasonable inferences from the facts that support the non-moving party's claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Non-moving parties that can show reasonable minds could differ deserve to have their case heard by a jury. *Id.* at 250–51.

The court does not resolve material disputed material fact issues or matters of credibility at the summary judgment stage. *Id.* at 255.

## III. LEGAL ARGUMENT

### The Law of Disability-Based Discrimination

Plaintiffs allege that Mayo violated the ADA and RA which both require places of public accommodation or recipients of federal funding to take effective action to overcome communication barriers in order to ensure that deaf people are not denied equal access to, and to benefit from, all of Mayo hospital's services, programs, and activities. *See* 42 U.S.C. § 12182 (ADA) and 29 U.S.C. § 794(a) (RA).

The RA provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). In *Barnes v. Gorman*, 536 U.S. 181, 189 (2002), the United States Supreme Court likened the grant of federal financial assistance to consideration furnished in exchange for a contractual promise by the recipient not to discriminate on the basis of disability. *See also Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1197 (11th Cir. 2007) (citing *Barnes*, 536 U.S. at 189); *United States v. Bd. of Trustees of Univ. of Alabama*, 908 F.2d 740, 750 (11th Cir. 1990) (holding that Congress conditioned the grant of federal financial assistance on providing qualified sign language interpreters when necessary).

Since Mayo receives federal financial assistance through Medicare, Medicaid, and other federal health insurance programs, Mayo must comply with §504 of the RA.

Congress directed the Department of Justice to develop regulations to enforce and implement the RA and ADA statutes. DOJ regulations state that "[n]o qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity." 28 C.F.R. § 41.51(a). The regulation defines discrimination to include (i) denying a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service; (ii) affording a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others. 45 C.F.R. § 84.4(a). Mayo may not "limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service." *Id.* at § 84.4(a)(vii).

The ADA mandates "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. 42 U.S.C. § 12182. The regulations implementing the ADA specify that public accommodations, such as Mayo, must provide qualified ASL interpreters or other effective auxiliary aids to ensure deaf people have effective communication in order to fully and equally benefit from its hospital services. 28 C.F.R. § 36.303(c)(1). Public accommodations are strongly encouraged to consult with deaf individuals to determine what type of auxiliary aid is needed to ensure effective communication. While the entity may choose which auxiliary aid it will provide, the auxiliary aid it selects must result in "effective communication" equal to what non-disabled people experience. 28 C.F.R. § 36.303(c)(1)(ii). "**When**

**[Mayo] ignores the communication needs of the individual requiring an auxiliary aid or service, it does so at its peril. For if the communication provided [to Saunders and Branden] is not effective, [Mayo] will have violated title III of the ADA**." DOJ 2010 Guidance and Section-by-Section Analysis, 28 C.F.R. Part 36, Appendix A (emphasis added).

The laws also affirmatively require Mayo to provide auxiliary aids and services (including ASL interpreters) to remove communication barriers and ensure that deaf people are able to communicate effectively in order to have the same benefits and services of Mayo's medical programs and services that hearing people have. This includes using auxiliary aids that will ensure effective communication with deaf people. 28 C.F.R. § 36.303 (a). "Effective communication" means communication that is as effective as communication with hearing people. 28 C.F.R. 26.303 (c).

## A. Material Facts in the Record Show That Mayo Violated the ADA and RA When It Failed to Provide Effective Communication during Plaintiff's Appointments

Courts have routinely held that genuine issues of material fact exist on claims brought by deaf patients alleging that the hospital failed to provide necessary and effective auxiliary aids, precluding summary judgment. *See, e.g.*, *Posner v. Adventist Health Care, Inc.*, Civ. No. JKS 08-3306, 2011 WL 2640118, at *5–6 (D. Md. June 25, 2010); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 270–71 (2d Cir. 2009); *Boyer v. Tift Cnty. Hosp. Auth.*, No. 7:06-CV-027 (HL), 2008 WL 2986283, at *7-8 (M.D. Ga. July 31, 2008); *Majocha v. Turner*, 166 F. Supp. 2d 316, 316 (W.D. Pa. Sept. 13, 2001); *Falls v. Prince George's Hosp. Ctr.*, Civ. A. No. 97-1545, 1999 WL 33485550, at *23–26 (D. Md. March

16, 1999); *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 827–28 (D. Md. 1998); *Wilson by Hinn v. State of North Carolina*, 981 F.Supp. 397, 406 (E.D.N.C. 1997). As recently as 2013, the Eighth Circuit found genuine issues of material facts existed when a deaf medical student claimed the auxiliary aides provided by his school for meetings with his hearing patients (and school courses) were not effective. *Argenyi v. Creighton Univ.*, 703 F.3d 441, 441 (8th Cir. 2013).[5]

To assert a discrimination claim under either statute, Branden and Saunders must show that (1) they are disabled; (2) Mayo is a "place of public accommodation (for ADA purposes) and receives federal funding (for RA purposes)"; and (3) Mayo discriminated against them based on their disability. *See Argenyi*, 703 F.3d at 447 (citing *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076–77 (8th Cir. 2006)).

Since the ADA and the RA are "similar in substance," courts treat the case law interpreting them as "interchangeable." *Id.* at 448. The Parties do not dispute that both Branden and Saunders are disabled with hearing loss and that Mayo, as a hospital that accepts Medicare and Medicaid insurance on behalf of patients, is a place of public accommodation that receives federal funding. To satisfy the third prong of their disability discrimination claim, Branden and Saunders demonstrate that there are sufficient disputed facts in evidence to show that Mayo discriminated against them based on their disability

_____

[5] Due to the significant number of cases that have already settled by deaf patients with claims against Minnesota hospitals with ample corrective action requiring NAD IV certification and above, there is minimal ADA Title III case law (*See* Macpherson Aff. ¶4, Attachment 1).

when Mayo failed to provide effective communication to Mayo's benefits and services equal to the benefits hearing patients receive at Mayo.

1. ***Evidence shows Mayo's staff sign language interpreters were not qualified to interpret for Plaintiffs' appointments, and Mayo did not provide an alternative effective auxiliary aid.***

   a. **The record demonstrates there is a factual dispute as to Plaintiffs' inability to understand Bruns and Rasmusson and miscommunication at medical appointments.**

Whether the auxiliary aids Mayo provided were effective is a fact-intensive question inappropriate for resolution on a motion for summary judgment. *See Chisoim v. McManimon*, 275 F.3d 315, 327 (3d Cir. 2001) ("Generally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment."); *see also, e.g.*, *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1199 (10th Cir. 2007); *Button v. Bd. Of Regents of Univ. & Cmty. College Sys. of Nev.*, 289 Fed. App'x 964, 66–68 (9th Cir. 2008); *Hayden v. Redwoods Cmty. Coll. Dist.*, No. C-05-01785NJV, 2007 WL 61886, at *27–28 (N.D. Cal. Jan. 8, 2007).

For Plaintiffs to have equal access at Mayo's hospital, Mayo must provide the necessary auxiliary aids to ensure effective communication with them. 28 C.F.R. § 36.303(c). A "[q]ualified interpreter means an interpreter who, via a video remote interpreting (VRI) service or an on-site appearance, is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary." 28 C.F.R. § 36.104. Saunders and Branden requested auxiliary aides in the form of a qualified interpreter for their medical appointments.

The record demonstrates Bruns and Rasmusson could not interpret effectively or accurately when they read Plaintiffs' ASL signs and sentences. They also could not express in English or ASL correct and accurate interpretation into the target language for Plaintiffs or the doctors.

The record demonstrates multiple calls, meetings, and emails where Saunders notified Mayo's Language Department that she and Branden could not understand Rasmusson and/or Bruns. (Saunders Aff. ¶9, 10, 22, 24, 29-31, 36; Branden Aff. ¶18, 19, 25; Saunders 19:9–23, 26:2-27:22, 31:7–15, 38:3–39:24, 42:22–43:31, 45:9–16, 51:13–25, 52:1–6, 75:22–78:12; Branden 21:13–19, 36:16–18, 39:13–20, 75:4–76:5; Hughes 88:24–89:7, 107:9–17, 179:15–180:13, 197:3–202:21; Dorsett 34:15–22.) As early as 2004 or 2005 Saunders made it known to Mayo that she could not understand Bruns or Rasmusson. (Saunders Aff. ¶¶7–16; Saunders 26:2–27:22.) Over a five-year period, Saunders repeatedly expressed very specific reasons for why communication was not effective. (Saunders Aff. ¶20.) Specifically with regard to Rasmusson, Saunders expressed Rasmusson could not understand her ASL signs or her fingerspelled words. (Saunders Aff. ¶11.) When Saunders was attempting to communicate to her doctor important healthcare information, Rasmusson interrupted Saunders to request clarification so frequently that Saunders lost her train of thought. (Saunders Aff. ¶13.) Saunders could not communicate at a normal, sophisticated, conversational pace with her doctor in a manner equal to how hearing people would be able to converse with a doctor. (Saunders Aff. ¶14.) On the receiving end of the communication, Saunders could not grasp the specific and accurate information her doctors were attempting to communicate with her because Rasmusson was

not able to convey the specialized English medical terms into appropriate ASL vocabulary and grammatical structure. (Saunders Aff. ¶15.) Saunders had to repeatedly ask her doctor to reiterate complex information. (Saunders Aff. ¶¶11, 27.) Even after multiple repetitions, Saunders understood only the "jist" of what the doctor was saying, and not the full breadth of the communications.

At the three December 2010 and January 2011 prenatal appointments, Saunders often sought assistance from her partner, Branden, to assist her with understanding parts of the communication. (Saunders Aff. ¶28.) Branden, however, also struggled to understand Rasmusson. (Saunders Aff. ¶28.) Branden expressed the same difficulty with understanding Rasmusson, although because he has some ability to read lips, was able to catch Rasmusson's omissions of crucial signs when she interpreted into English for Dr. Davies. (Branden Aff. ¶¶15, 17–19.) Branden, not intending to serve as Saunders' interpreter, attempted to "fill in" for Rasmusson's omissions and errors. (Branden Aff. ¶¶16–17.) Branden also could not understand Rasmusson's English-like signs and incomplete sentences. (Branden Aff. ¶¶19-20.) As a result, Dr. Davies did not receive the full breadth of communications expressed by Plaintiffs. (Branden Aff. ¶¶19.) Rasmusson failed to interpret "effectively and accurately" as the ADA requires.

One clear example demonstrating miscommunication between Plaintiffs and Rasmusson was at the December 28, 2010 prenatal appointment. Rasmussen interpreted incorrect information indicating Dr. Davies intended to strip Saunders' cervical membranes to induce labor at the next appointment. (Branden Aff. ¶28; Saunders Aff. ¶40; Branden 48:14–20; Saunders 56:21–58:25.) Plaintiffs understood from Rasmussen's

interpretation that stripping of membranes would likely induce delivery on January 4, 2011 and they believed that they should prepare for childcare for Saunders' son. (Saunders Aff. ¶34; Branden Aff. ¶25; Branden 48:14–20; Saunders 58:7–59:10). However, when Plaintiffs arrived on January 4, 2011 fully expecting to deliver, Davies denied stating that he intended to strip Saunders' cervical membranes that day. (Saunders Aff. ¶41; Branden Aff. ¶32; Branden 86:16–23; Saunders 67:10–70:2.) Upon realizing the serious mistake in Rasmusson's interpreting, Branden and Saunders experienced an even greater increase of stress and anxiety over crucial information being miscommunicated. (Branden Aff. ¶¶33–35; Saunders Aff. ¶¶43–44.)

### i. *Complaints from other Deaf patients and the State of Minnesota*

Additional evidence that Rasmusson and Bruns are not qualified interpreters can be found in the experiences of other deaf patients and companions at the same time period. The record reflects multiple deaf patients and companions reporting to Mayo the same kinds of problems when Rasmusson or Bruns interpreted communications for them: making errors interpreting; not interpreting information doctors communicated to the patients; not being able to interpret when the clients were signing at normal speed; frequently asking the patients to repeat what they had signed; and telling the patients they did not understand signs the patients were making or words the doctors were saying. (J. Doose Aff. ¶¶6–14; P. Doose Aff. ¶¶4–11; Slater Aff. ¶¶4–11, 15–16; Hughes Ex. 7.) When multiple deaf patients report the same kinds of problems with Mayo's interpreters, this is strong supportive evidence that the interpreters are not "qualified interpreters" as the Department of Justice mandates in its regulations.

The State of Minnesota, Department of Human Services, Division of Deaf and Hard of Hearing Services (DHHS) also received so many complaints about Mayo's staff interpreters that they requested a meeting with Mayo to implement changes (Bell Ex. 15; Hughes Ex. 10, DEF 00314.) DHHS expressed concerns from Mayo patients about incorrect information conveyed, interpreters unfamiliar with medical terminology, patients struggling to understand the interpreter and the interpreter struggling to understand (the deaf patients). (Hughes Ex. 7, DEF 00380.) DHHS drafted letters and reports summarizing concerns with Mayo interpreters to give other state agencies including the Commission Serving Deaf, DeafBlind and Hard of Hearing Minnesotans. (Ex. B, Saunders000540–41.)

## ii. *Staff interpreters are not certified at the industry standard used statewide.*

The regulations do not explicitly identify a certification level ASL interpreters must hold to meet the requirement of being a "qualified interpreter." The minimum interpreter certification requirements used by the majority of Minnesota hospitals provide the standard for determining whether a person is a "qualified interpreter" for medical settings. Based on the fact that Mayo's interpreters were certified only at NAD III and subsequently failed the NIC exam is significant evidence for a jury to determine that Bruns and Rasmusson were not qualified to interpret for Plaintiffs. All known hospitals in the Twin Cities area require ASL interpreters to meet specific minimum interpreter certification standards at NAD IV and above. (Macpherson Aff. ¶8, Attachment 1.) This standard is not limited to only the Twin Cities area, but also applies to several healthcare facilities in St. Cloud and Duluth, cities smaller in population density and sophistication to Rochester, Minnesota.

Both Bruns and Rasmusson failed the NIC test when they finally took the exam in late 2012. Neither of them currently or ever held any of the minimum interpreting certificates to practice in medical settings. Based on their subpar certification alone, Rasmusson and Bruns could not have worked in any hospital in the Twin Cities, St. Cloud, or Duluth in 2010 and could not seek employment through a sign language interpreting agency for any medical interpreting. (Juberian Aff. ¶10; Kenney Aff. ¶8; Macpherson Aff. ¶¶7, 9; Wellumson Aff. ¶8.)

**b. Mayo either did not provide other auxiliary aids or when provided, were ineffective.**

Contrary to Mayo's claim, Mayo did not provide Plaintiffs with equal access through the use of alternative auxiliary aids because either Mayo did not offered them to Plaintiffs, or they did not result in effective communication.

**i. _Mayo only exchanged written notes during Plaintiffs' last appointment, and whether written communication results in effective communication is a material and substantial question of fact for a jury to decide, precluding summary judgment._**

Mayo did not attempt to supplement communication by using written notes during Saunders' three 2010 neurology appointments or Plaintiffs' three prenatal appointments. Instead, the doctors only relied on Mayo's incompetent interpreters to convey complex medical information. Only during Saunders July 11, 2011 neurological exam did Mayo's doctors provide written notes. Because Mayo once again chose to arrange for Rasmusson and no one else, Saunders and Dr. Cascino mutually declined Rasmusson as the interpreter for the appointment, leaving no alternative other than writing back and forth.

The exchange of written notes during such a lengthy and complex medical appointments is not "effective communication" by ADA standards. When considering the exchange of written notes as an effective auxiliary aid, a public accommodations must consider "the nature, length, and complexity of the communication involved[] and the context in which the communication is taking place." 28 C.F.R. § 36.303(c)(1)(ii). The U.S. Department of Justice regulations further explain:

> [A]n individual with a disability who is deaf or hard of hearing may need a <u>qualified</u> interpreter to discuss with hospital personnel a diagnosis, procedures, tests, treatment options, surgery, or prescribed medication (e.g., dosage, side effects, drug interactions, etc.). In comparison, an individual who is deaf or hard of hearing who purchases an item in the hospital gift shop may need only an exchange of written notes to achieve effective communication.

28 C.F.R. pt. 36, app. A.[6]

It is undisputed that the conversations between Mayo's doctors and Plaintiffs during the medical appointments were not short, simple, everyday conversations. Plaintiffs' original purpose for seeking medical help from Mayo's world-renowned medical

---

[6] *See* U.S. Dept. of Justice, *ADA Business Brief: Communicating with People Who Are Deaf or Hard of Hearing in Hospital Settings* (Aug. 11, 2005), http://www.ada.gov/hospcombr.htm (explaining that "[e]xchanging written notes or pointing to items for purchase will likely be effective communication for <u>brief and relatively</u> simple face-to-face conversations, such as a visitor's inquiry about a patient's room number or a purchase in the gift shop or cafeteria . . . [but] [f]or more complicated and interactive communications, such as a patient's discussion of symptoms with medical personnel, a physician's presentation of diagnosis and treatment options to patients or family members . . . it may be necessary to provide a <u>qualified</u> sign language interpreter or other interpreter" (emphasis added)).

professionals was due to the complex and high-risk nature of Saunders' seizure disorder and pregnancy. And while Mayo correctly points out that Dr. Shepard-Kegl's report states that Saunders' English "is good and her reading is adequate for most **everyday purposes**," (Shepard-Kegl Report 67, ECF 46-8 (emphasis added))[7], it is unreasonable for a jury to find that the complicated discussions of procedures, surgeries, diagnosing, and treatment options are simple, everyday conversations that a person at a **sixth-grade** reading level (or 11 year-old) would understand. (*Id.* at 65 (emphasis added).)

Additionally, even when there was writing back and forth, Saunders could not benefit from the full breadth of information that would normally occur in a conversation. Even without considering the difficult and intricate nature of the medical appointments, writing longhand takes a lot of time, resulting in writing fewer words per minute; therefore, reducing amount the information provided to patients compared to the quantity of information when communicated orally, and giving rise to a material and substantial question of fact of whether written communication resulted in effective communication.

### ii. *Relying on Branden's lip-reading abilities of a Doctor with a British accent did not result in effective communication.*

Mayo cannot avoid its obligation to provide effective communication and legal responsibility to provide appropriate auxiliary aids and services to Plaintiffs by relying on

---

[7] Dr. Shepard-Kegl's Expert Report was submitted with Mayo's Motion for Summary Judgment. (*See* ECF No. 46-8.)

Branden, a profoundly deaf companion, to provide effective communication for Saunders because of the interpreter's deficiencies.

"A public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities. This includes an obligation to provide effective communication to companions who are individuals with disabilities." *See* 28 C.F.R. § 36.303(c)(1). A "companion" as "a family member, friend, or associate of an individual seeking access to, or participating in, the goods, services, facilities, privileges, advantages, or accommodations of a public accommodation, who, along with such individual, is an appropriate person with whom the public accommodation should communicate." 28 C.F.R. § 36.303(c)(1)(i). "Effective communication with **companions** is particularly **critical** in health care settings where miscommunication may lead to misdiagnosis and improper or delayed medical treatment." 28 C.F.R. pt. 36, app. A. Branden is a "companion" within the meaning of the law, and understands Mayo has the same legal obligation to provide auxiliary aids and services to himself to ensure effective communication.

It is undisputed that Branden is profoundly deaf, and the parties considered him disabled under the law. It is also undisputed that Branden, as long-term partner and father of Saunders' inutero baby, falls under the definition of a companion of Saunders, who sought access to Mayo's services, facilities, privileges, advantages, and accommodations. Branden was not an appropriate person for Mayo to use for communications for Saunders' medical treatment. By denying Branden, as a companion, effective communication

through the use of auxiliary aids and services, Mayo discriminated against Branden, treating him as a lesser person compared to individuals who can hear, violating the law.

Second, Mayo cannot evade its legal responsibility to ensure effective communication by relying on Branden to interpret or facilitate effective communication when its interpreters could not. Mayo argues that even if Rasmusson was unqualified, it still met its duty by "allowing Saunders to rely on Branden" to "do the interpreting between the physician and herself." (Def.'s Mem. Supp. Mot. Summ. J. 30-31, ECF No. 43.) However, the law is clear that in Plaintiffs' situation, Mayo cannot skirt its legal obligations to ensure effective communication by relying on Branden to interpret for Saunders during medical appointments. "A public accommodation shall not require a disabled individual to bring another person to interpret for him/her." 28 C.F.R. § 36.303(c)(2). It also mandates, "A public accommodation shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication . . . ." 28 C.F.R. § 36.303(c)(3) (emphasis added).

The Department of Justice has further expounded this point by stating:

> "[The regulation] prohibits medical professionals (and other public accommodations) from requiring or forcing individuals with disabilities to bring other individuals with them to facilitate communication so that the public accommodation will not have to provide appropriate auxiliary aids and services. The public accommodation cannot avoid its obligation to provide [a qualified] interpreter. . . .

28 C.F.R. pt. 36, app. A. It also makes clear that "[a]bsent an emergency situation involving an imminent threat to the safety or welfare of an individual or the public," "[t]he Department states unequivocally that consent of, and for, the accompanying adult to

facilitate communication must be provided freely and voluntarily both by the individual with a disability **and** the accompanying adult." *Id.* (emphasis added).

The undisputed facts demonstrate that Mayo scheduled Saunders' medical appointments far in advance and not an emergency involving an "imminent threat to the safety or welfare of [Saunders] or the public." *See* 28 C.F.R. § 36.303(c)(3). Branden did not freely and voluntarily agree to interpret for Saunders. Saunders did not freely and voluntarily request to have Branden interpret for her until no other auxiliary aid was provided to her. Instead, Mayo coerced Branden into the impossible situation of trying to understand the doctor and Rasmusson's substandard interpreting skills in order to interpret for Saunders. Additionally, Branden struggled to read the lips of Dr. Davies because of his British accent and stated that it was difficult to understand him. While his lip-reading skills are better than Saunders', Branden did not catch every error and mistake made by Rasmusson during the medial appointments; he merely noticed mistakes were happening and tried to correct them as best he could. If Saunders had a choice between a qualified interpreter and Branden's piecemeal interpreting ability, she would have chosen the qualified interpreter. A reasonable factfinder could find that merely observing and correcting some mistakes is not the same as being an effective auxiliary aid equal to the benefits and services provided to hearing expectant fathers and mothers.

The ADA and RA require medical providers to provide appropriate auxiliary aids to allow for effective communication equal to what hearing people receive. Mayo had the legal obligation to provide both Saunders and Branden with appropriate auxiliary aids and services to ensure effective communication with Mayo doctors. Relying on an unqualified

interpreter, a deaf partner or handwritten notes is not what the law requires, and certainly is not equal to the benefits and services hearing patients receive at Mayo Clinic.

**B. Plaintiffs Are Entitled to Seek Compensatory Damages under the RA**

Plaintiffs demonstrate that Mayo was deliberately indifferent toward Saunders' and Branden's requests for effective communication because the evidence shows Plaintiffs gave repeated notice of their need to Mayo, and Mayo knowingly refused to provide the necessary *qualified* interpreter, during Plaintiffs' medical appointments.

> **1. A genuine issue of material fact exists as to whether Mayo intentionally discriminated against Plaintiffs by demonstrating deliberate indifference towards their request for effective communication.**

This circuit held that intentional discrimination can be "inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011). Such demonstration of intent "does not require a showing of personal ill will or animosity toward the disabled person." *Id.* at 389. Therefore, Branden and Saunders do not need to prove that Mayo acted with such animosity; only that they gave Mayo repeated notice of their need, and Mayo knowingly refused to provide the necessary aid.

The "deliberate indifference" standard is a "rough parallel" to notice-and-opportunity requirements. *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). The test is whether a public accommodation's conduct was undertaken with deliberateness—whether Mayo had notice of Plaintiffs' requests for auxiliary aids necessary to provide

effective communication and consciously chose not to provide the auxiliary aids necessary for effective communication. *See, e.g.*, *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276 (2d Cir. 2009) ("[D]eliberate indifference must be a deliberate choice rather than negligence . . . [or] inaction") (quotation marks and ellipses omitted); *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 829 (D. Md. 1998) (holding that there is deliberate indifference when a covered entity "willfully" withholds necessary auxiliary aids). Such willful conduct occurs when an individual with a disability requests auxiliary aids and such a request goes "unheeded." *Loeffler*, 582 F.3d at 276 (holding that there was deliberate indifference when a hospital ignored multiple requests for auxiliary aids and services necessary to provide effective communication after the hospital provided a different auxiliary aid that resulted in ineffective communication).

The question of intent in accommodations cases does not require that Plaintiffs show that Mayo harbored an animus toward the disabled patient or companion. Rather, plaintiffs may establish discrimination occurred simply by an intentional, willful decision not to provide the effective aid. Plaintiffs told Mayo they could not understand Rasmusson (and before that, Bruns). Mayo continued to send Rasmusson to interpret for neurological and prenatal medical appointments. While Mayo may (or may not) have believed itself to be within the confines of the law, it nevertheless intentionally violated the ADA and the RA by willfully withholding from Branden and Saunders the auxiliary aids to which they are entitled under the law. Mayo had notice of the potential risk that communication would not be effective, and Mayo knowingly refused the accommodation. *See id.* at 829 (citation omitted). As described, a covered entity bears the risk of liability when it "intentionally

opts" to provide a lesser auxiliary aid and service. *Id.*; *see also, e.g.*, *Liese*, 701 F.3d at 351–52; *Duvall*, 260 F.3d at 1137–40.

The case law thus makes clear that Plaintiffs must demonstrate only that they requested a specific auxiliary aid or service, and Mayo intentionally opted to provide a different auxiliary aid that ultimately proved ineffective. *See, e.g.*, *Liese*, 701 F.3d at 351–52 (noting that covered entity was liable when the different auxiliary aids it offered did not result in effective communication); *Duvall*, 260 F.3d at 1137–40 (same); *Proctor*, 32 F. Supp. 2d at 829 (same). Such deliberate indifference may also be established when a covered entity **persists** in its course of conduct **despite notice** from the individual with a disability that the proffered auxiliary aid and service is not working. *Duvall*, 260 F.3d at 1137–38 (finding deliberate indifference was established after the public accommodation continued to <u>only</u> offer the lower auxiliary aid after the deaf individual had tried the proffered auxiliary aids without success and notified the public accommodation that it was not effective) (emphasis added).

A "strong likelihood" that Mayo's policy of repeatedly using its staff interpreters for Plaintiffs may be established by Plaintiffs, as individuals with a disability, requesting a specific auxiliary aid and service and the Mayo intentionally opting to provide a lesser auxiliary aid and service that ultimately does not result in effective communication. *See Meagley*, 639 F.3d 389; *e.g.*, *Liese*, 701 F.3d at 351–52 (noting that [the hospital] was liable when the lesser auxiliary aids it offered did not result in effective communication); *Duvall*, 260 F.3d at 1137-40 (same); *Proctor*, 32 F. Supp. 2d at 829 (same). Such a "strong likelihood" may also be established when a covered entity persists in its course of conduct

despite notice from the individual with a disability that the proffered auxiliary aid and service is not working. *See, e.g.*, *Duvall*, 260 F.3d at 1137–38 (noting that the deaf individual had tried the proffered auxiliary aids and services without success).

### a. A reasonable jury could find Mayo's repeated use of Rasmusson and Bruns demonstrates deliberate indifference.

In the present case, there are sufficient facts for Branden and Saunders to establish that Mayo acted with deliberate indifference. First, Saunders and later Branden provided ample notice that Mayo's interpreters were not providing effective communication. They did this by telling the interpreters, requesting alternate interpreters, explaining the communication problems by phone and in-person to Hughes, and by emailing Voller. Mayo still continued to send Rasmusson to interpret for medical appointments and communication was still not effective.

Second, it was within the Mayo Language Department's ability to provide for Branden and Saunders' requests for a qualified interpreter. Likely, as the largest hospital in Minnesota, with an operating budget of two million dollars for its Language Department alone, Mayo had the financial resources to provide and pay for a qualified interpreter. What's more, providing a qualified contract interpreter was an auxiliary aid paid for out of a separate general fund, which Voller stated was an even larger pot of money. The record also reflects that interpreting agencies were ready, willing, and able to send qualified medical sign language interpreters for Mayo's deaf patients, but Mayo never made a request. (Donato Aff. ¶11; Wellumson Aff. ¶16; Kenney Aff. ¶15; Juberian Aff. ¶17.) Video remote interpreting was also an available resource, but Mayo never got around to

choosing a vendor.  (Hughes 99:2–100:4.)

**b.  A reasonable jury could find Mayo's emails and actions demonstrate they were deliberately indifferent toward Plaintiffs' repeated requests for a qualified interpreter.**

Mayo forced Branden and Saunders to use Rasmusson as their interpreter.  It was Mayo's position that they needed to just "*deal*" with her.  (Hughes 100:12–16; Hughes Ex. 10, DEF 00281.)  Mayo was not going to provide any *"luxury"* of providing Saunders and Branden the necessary communication aids they needed for a smooth labor and delivery. (Hughes Ex. 10, DEF 00272.)  Mayo did not mind that Saunders was in tears and terribly upset by their surprise visit to her prenatal appointment.  Hughes and Voller were going to meet with Plaintiffs whether they liked it or not because Plaintiffs were *"discriminating against [Mayo's] staff."*  (*Id.*)  Even after their involuntary meeting and long explanation of why they could not understand Rasmusson, Mayo forced Plaintiffs to use Rasmusson to interpret for the final appointment.  And finally, for Saunders' last appointment, Mayo went so far as to write a long email to Saunders neurologist explaining why and how the doctor must use Rasmusson as his interpreter.  (*Id.*, DEF 00275).  With this laundry list of direct evidence to present at trial, it is very likely a jury could find Mayo acted with deliberate indifference toward Plaintiffs.

**c.  A reasonable jury could find Mayo was deliberately indifferent to Minnesota standards for medical interpreters and other deaf patient complaints.**

In 2007, Mayo chose to make Rasmusson a full-time interpreter even after the standards in Minnesota were established that NAD IV was the lowest certification to be a qualified interpreter for medical settings.  Once Mayo realized its interpreters needed to

improve their skills, they did not require them to gain appropriate certification until two years later. When Bruns and Rasmusson failed the National Interpreter Certification exam, Mayo finally terminated their employment.

Supportive evidence shows Mayo not only deliberately indifferent toward Saunders and Branden, but to multiple other deaf patients and companions. When other deaf people complained about their inability to understand Bruns and/or Rasmusson and requested qualified interpreters, Mayo continued to send the staff interpreters to subsequent appointments. (J. Doose Aff. ¶¶6, 13–14; P. Doose Aff. ¶¶5, 8, 11; Slater Aff. ¶¶13, 15–16.) In 2010, complaints were so numerous and egregious that the State of Minnesota (DHS) was compelled to intervene and assist Mayo with improving its communication for deaf people. (Ex. A, Saunders000535; Hughes Ex. 10, DEF 00314.) Nevertheless, Mayo continued to use Bruns and Rasmusson to interpret for deaf patients for many years to follow.

In sum, Branden and Saunders can establish Mayo's deliberate indifference by demonstrating that Mayo (1) was on notice of their request for effective auxiliary aids to ensure equal access when Plaintiffs repeatedly told Mayo they couldn't understand Rasmusson; and (2) Mayo consciously chose to provide lesser and ineffective auxiliary aids by repeatedly sending Rasmusson to Plaintiffs' 2010-2011 appointments despite having available resources to appropriately accommodate Branden's and Saunders' disability. *See, e.g.*, *Liese*, 701 F.3d at 351–52; *Duvall*, 260 F.3d at 1137–40; *Proctor*, 32 F. Supp. 2d at 829.

Because it is not unreasonable for a jury to find Mayo acted with deliberate

indifference when it received Branden and Saunders' request for effective auxiliary aids, and because Mayo had the ability to accommodate Saunders and Branden's request but continually choose **not** to provide them with effective communication, the court should deny Mayo's motion to dismiss Branden's and Saunders' claim for compensatory damages under the RA.

## C. <u>Both Plaintiffs Have Standing to Request Injunctive Relief Under the ADA and RA.</u>

### 1. *Plaintiffs Have Standing to Request Injunctive Relief Under the ADA Because They Were Disabled Persons Who Sought Access To Mayo's Programs and Benefits.*

Mayo's assertion that Branden and Saunders lack standing to request injunctive relief under the ADA fails because both Plaintiffs have experienced harm by Mayo's discrimination and a favorable decision by this Court will permit Saunders and Branden to return to Mayo for their present prenatal and neurological medical needs.

Standing to assert a claim over a federal question such as this requires the plaintiff to prove three elements: (1) that the plaintiff suffered, or will imminently suffer, a "concrete and particularized injury" involving "an invasion of a legally protected interest;" (2) that the injury and conduct complained of are causally connected; and (3) that it is "likely," that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 1992) (citations omitted). To survive a summary judgment motion asserting a lack of standing, the plaintiff must set forth, by affidavit or other evidence, specific facts that prove the three stated elements. *Id*. at 561; *see* Fed. R. Civ. Pro. § 56(e). The facts that the plaintiff sets forth will be taken as true for purposes of summary

judgment. *Id.*

First, both Branden and Saunders, as deaf individuals who use ASL to communicate effectively with hearing people in medical settings, suffered a "concrete and particularized injury" involving "an invasion of [their] legally protected interest" under Title III of the ADA to fully and equally enjoy, without discrimination, Mayo's facilities, privileges, advantages, and accommodations. 42 U.S.C.A. § 12182. As stated above, Mayo is required to provide "appropriate auxiliary aids and services where necessary to ensure *effective communication* with individuals with disabilities," and to "consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure *effective communication*." *Argenyi v. Creighton Univ.*, 703 F.3d 441, 448 (8th Cir. 2013) (citing 28 C.F.R. § 36.303(c)(1)) (citations omitted) (emphasis added). Mayo's failure to provide qualified, effective interpreters for Plaintiffs' medical appointments denied Branden and Saunders their right to "effective communication" and usurped their full enjoyment of Mayo's accommodations and advantages for Saunders' as a patient, Branden as a supportive companion, and both Plaintiffs as expectant parents in a high-risk situation.

In addition to the normal anxiety and stress that non-disabled expectant mothers experience during high-risk pregnancies, Saunders was required to suffer the additional stress and anxiety of not receiving access to critical and important information about herself, her baby's health, imminent labor, and uncertain delivery. She had no choice but to rely on her deaf husband's meager attempts to fill in the gaps for the deficiencies of Mayo's interpreter. Branden was also required to suffer the stress and anxiety of

monitoring the unqualified interpreter for errors and omissions and given no choice but to try to clarify for the interpreter and doctor when communication was not happening.  He was not able to enjoy the benefits and privileges equal to what hearing expectant fathers receive by being able to sit back and take in each stage of his first child's growth and development.

Second, because both Branden's and Saunders' injuries directly arise from a lack of access to effective communication that Mayo was required to but failed to provide, their injuries are indisputably causally related to the conduct complained of "and not . . . the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.

Third, contrary to Mayo's assertion that Branden and Saunders are not likely to return to Mayo Clinic, Plaintiffs are currently pregnant with a fourth child, intend to have more children, and wish to return to Rochester for her prenatal care and delivery on condition that Mayo provides them with the effective communication to which they are entitled.  Saunders would also like to return to the care of her Mayo neurologist, Dr. Cascino.  Although Mayo may or may not have made some changes in its interpreter personnel and policy, without injunctive relief mandating that Mayo provide qualified interpreters who can deliver effective communication, Branden and Saunders cannot entrust their care to Mayo.  Thus, the ongoing injury is more than "likely" to be "redressed by a favorable decision."

Finally, as the court in *Lujan* opined, if the plaintiff is ["himself an object of the action"], there is ordinarily little question that the action or inaction has caused him injury

and that a judgment preventing or requiring the action will redress it."  504 U.S. at 561–

62.

Because Plaintiffs suffered the "concrete and particularized injury" of

discrimination involving emotional distress, experienced "an invasion of a legally

protected civil right," the injury of discrimination and emotional distress are causally

connected, and it is "likely," that the discrimination will be "redressed by a favorable

decision" on injunctive relief mandating effective communication, Branden and Saunders

have standing to seek injunctive relief under the ADA and the Court should deny Mayo's

claim.

**2. *Plaintiff Branden Also Has Separate Standing As A "Companion" of A Disabled Person and Because Mayo Relied On Him to Provide Interpretive Services In Violation of 28 C.F.R. § 36.303(c)(3).***

Plaintiff Branden not only has standing because he was personally discriminated

against as a disabled individual, but also because of his association with Plaintiff Saunders

as her aid and companion and because Mayo required him to provide communication

services for Saunders in violation of 28 C.F.R. § 36.303(c)(3).

**a. Plaintiff Branden has standing because Mayo relied on him to provide interpretive services and facilitate communication during Saunders' appointments.**

Mayo argues Plaintiff Branden lacks separate standing as a companion based solely

on *McCullum v. Orlando Reg'l Healthcare Sys., Inc.,* a case not applicable to this matter.

768 F.3d 1135, 1142 n. 5 (11th Cir. 2014).  *McCullum* applies a regulation that is not

applicable to the current case because it involved discriminatory conduct that occurred

before 28 C.F.R. § 36.303(c)(3) was enacted.  *See McCullum*, 768 F.3d at 1142 n.5; *see*

*also* 28 C.F.R. § 36.303(c)(3). 28 C.F.R. § 36.303(c)(3) was enacted on September 15, 2010. *See id.* Branden's cause of action is based on discriminatory conduct occurring at Mayo from December 10, 2010 to January 4, 2011. Because the regulation was applicable to Mayo during that time period, Branden has standing to pursue a claim as a companion of a disabled person.

### b. Branden also has standing because of his association with Saunders as her aid and companion.

Additionally, Branden has standing to bring a claim against Mayo because he was Saunders' companion and Mayo denied Branden the benefits of Mayo's services based on his disability and his association with Saunders. "It is widely accepted that under both the RA and the ADA, [even] non-disabled individuals have standing to bring claims when they are injured because of their association with a disabled person." *McCullum*, 768 F.3d 1135, 1142 (11th Cir. 2014) (citation omitted). "[T]o gain entry to the courts, non-disabled parties bringing associational discrimination claims need only prove an independent injury causally related to the denial of federally required services to the disabled persons with whom the non-disabled plaintiffs are associated." *Loeffler*, 582 F.3d at 279.

Like the hearing children in *Loeffler* who had to interpret and communicate complicated and critical medical information to their deaf parents, "a service . . . that federal law says is guaranteed to any hearing impaired patient in a hospital," 582 F.3d at 283, Branden was forced to correct Rasmussen, repeat and clarify critical information regarding Plaintiff Saunders, and had to experience the stress and anxiety of not knowing whether, due to failed communication, his partner and mother of his soon-to-be-born child

was receiving appropriate care. This stress and anxiety was multiplied by the facts that Plaintiff Branden was in unfamiliar territory as it was his first experience having a child, and Plaintiff Saunders's prior cesarean and then-present seizure disorder made the pregnancy so complicated that only Mayo was willing to handle her prenatal care. These facts are undisputed, but any dispute raised as to their severity or ultimate effect on Plaintiff Branden's injuries "go to the extent of the injury suffered and the calculation of damages, not whether or not the statute itself affords [Plaintiff Branden] the right to claim that injury." *Id.*

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully asks the Court to deny Mayo's motion in its entirety.

DATED: January 5, 2015                          GILBERT LAW PLLC

                                                By:   s/Heather M. Gilbert
                                                      Heather M. Gilbert, #392838
                                                      2864 Middle Street
                                                      Suite 200
                                                      St. Paul, MN 55117
                                                      (651) 340-9642
                                                      heather@gilbertlawpllc.com

                                                ROB ROE LAW, LLC

                                                      Rob Roe, #270246
                                                      3254 Rice Street
                                                      St. Paul, MN 55126
                                                      (651)766-5886
                                                      rob@robroelaw.com

                                                ATTORNEYS FOR PLAINTIFFS